### State of Vermont v. William H. Harvey

[497 A.2d 356]

No. 84-185

Present: Allen, C.J., Hill, Underwood, Peck and Gibson, JJ.

Opinion Filed May 24, 1985

*James P. Mongeon*, Rutland County State's Attorney, and *Martha M. Smyrski*, Deputy State's Attorney, Rutland, for Plaintiff-Appellant.

*Andrew B. Crane*, Defender General, and *Henry Hinton*, Appellate Defender, Montpelier, for Defendant-Appellee.

**Gibson, J.** This case arises as an interlocutory appeal by the State, after the trial court granted defendant's motion to suppress statements given by him to Vermont State Police Corporal Brian Abbey. The court held that defendant did not make a voluntary, knowing and intelligent waiver of his constitutional right against self-incrimination, in violation of both the Fifth Amendment, applicable to the states through the Fourteenth Amendment, *Malloy* v. *Hogan*, 378 U.S. 1, 8 (1964), and, independently, of the Due Process Clause itself. We affirm the ruling below on due process grounds.

The relevant facts are as follows. In 1983, defendant became convinced that Vermont was about to be invaded by Russian forces and that local people with Russian names were spies. He perceived himself to have a "Davy Crockett" role in the "state army." After several months of aberrant behavior, he drove to Pittsfield early in the morning of October 24, 1983. where he allegedly entered a store and shot and killed the proprietress, Tania Zelensky. In a frenzied condition, defendant left the store, drove his car over an abutment and across the lawn of a park, and then ran into the nearby residence of his employer. His employer soon concluded that defendant was "nuts."

Corporal Abbey assumed custody of defendant approximately 45 minutes after the shooting. Defendant read the *Miranda* warnings, *Miranda* v. *Arizona*, 384 U.S. 436, 467–73 (1966), while Abbey recited them, then signed and dated the waiver form. Defendant agreed to talk but refused to sign any

statements. According to Abbey, "Defendant was sober and
. . . appeared to know what he was talking about":

> I think Mr. Harvey totally understood what I was read-
> ing to him and voluntarily waived his rights to an attor-
> ney and voluntarily talked to us. . . .

Abbey then questioned defendant, obtaining details of de-
fendant's activities and thoughts during the time before the
shooting, including an admission that he shot the victim and
a statement that he had "contemplated this for about 15 min-
utes prior to actually shooting her."

When asked whether at any point that day he doubted de-
fendant's capacity to waive those rights, Abbey replied, "No."
However, he later conceded that by the end of the questioning
he believed defendant had "flipped."

Defendant called Dr. William A. Woodruff, emeritus profes-
sor of psychiatry and director of the forensic clinic of the
University of Vermont Department of Psychiatry, to testify
as an expert on his behalf. Dr. Woodruff testified that, for
several days before the shooting, defendant was "in a[n] aura
or a state of mind in which he was exquisitely aware of things
. . . and misinterpreted several of them." Dr. Woodruff con-
cluded that defendant was going through "a paranoid stage
with obvious psychotic overlay," that during the paranoid
stage defendant's state of mind was "completely controlled by
that condition," and that defendant was deluded at the time
of the shooting.

Immediately after the shooting, according to the doctor,
defendant was "obviously so berserk . . . that he wouldn't have
understood what was going on." When asked if defendant
"had the mental capacity to grasp his right to remain silent,
the right to have an attorney present," Dr. Woodruff replied,
"I don't think he gave anything—it wouldn't have mattered to
him at that point. It wouldn't have mattered. Indifference."

In holding the confession involuntary, the court observed
"the Defendant's confession has not been shown to be an act
of free will." The court found credible Dr. Woodruff's testi-
mony that, for up to one hour after the victim was shot, de-
fendant was "paranoid and compulsive" and "would not have
understood what was going on." The court also concluded,

from defendant's abnormal mental state and the erratic character of his conversation, that his waiver of rights was "not an informed, knowing and intelligent waiver."

■■ Our first inquiry must be whether the court's findings and conclusions are supported by the record. It is the State's burden to establish, by a preponderance of the evidence, that defendant knowingly and intelligently waived his Fifth Amendment rights, *State* v. *Clark*, 143 Vt. 11, 12, 460 A.2d 449, 450 (1983), and he gave his confession voluntarily. *State* v. *Badger*, 141 Vt. 430, 439, 450 A.2d 336, 341 (1982). It is for the trial court to determine the weight and sufficiency of the evidence as well as the credibility of the witnesses. Its determination must stand if supported by credible evidence, even though there may be inconsistencies or substantial evidence to the contrary. *State* v. *Wall*, 137 Vt. 482, 486, 408 A.2d 632, 635 (1979). Findings of fact may not be set aside unless they are clearly erroneous. *State* v. *Driscoll*, 137 Vt. 89, 95, 400 A.2d 971, 975 (1979). We are convinced from a review of the record that substantial evidence supports the court's findings and that they are not clearly erroneous. Thus, unless the trial court's determination was wrong as a matter of law, it must stand. *Id.*

■■ We conclude that use of the statements of a defendant who lacked capacity to make a knowing and intelligent waiver of his constitutional rights would violate due process. We note that most of the United States Supreme Court cases invalidating a confession on the ground that a defendant was denied due process involved some form of police coercion. E.g., *Mincey* v. *Arizona*, 437 U.S. 385, 401–02 (1978); *Haynes* v. *Washington*, 373 U.S. 503, 503–15 (1963); *Payne* v. *Arkansas*, 356 U.S. 560, 566–68 (1958); *Chambers* v. *Florida*, 309 U.S. 227, 239–41 (1940); *Brown* v. *Mississippi*, 297 U.S. 278, 281–86 (1936); cf. *New York* v. *Quarles*, 467 U.S. 649, — n.5, 104 S. Ct. 2626, 2631 n.5 (1984) (although Fifth Amendment claim fails, defendant may still claim on remand that he was "coerced under traditional due process standards"). However, a waiver of one's constitutional rights must not only be voluntary; it must also be a knowing, intelligent act done with sufficient awareness of the relevant circumstances and likely con-

sequences. *Brady* v. *United States*, 397 U.S. 742, 748 (1970) (footnote omitted). It is the State's burden to establish, by a preponderance of the evidence, that the defendant knowingly and intelligently waived his constitutional rights. *State* v. *Clark, supra,* 143 Vt. at 12, 460 A.2d at 450.

In *Blackburn* v. *Alabama*, 361 U.S. 199 (1960), the United States Supreme Court held that, when a person is completely without capacity, *no coercion* need be shown to render the confession inadmissible. In that leading case, the Court stated:

> Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion.

*Id.* at 207.

There was substantial evidence to support the court's finding that defendant was completely without capacity and unable knowingly and intelligently to waive his constitutional rights at the time he gave his confession to Corporal Abbey. Accordingly, as a matter of law, the suppression order must be affirmed. *Id.; State* v. *Clark, supra; State* v. *Wall, supra; State* v. *Driscoll, supra.*

*The trial court's order suppressing statements given by defendant to Corporal Abbey is affirmed. Case remanded for further proceedings.*