## State of Vermont v. David P. Brunell

[554 A.2d 242]

No. 86-468

Present: **Allen, C.J., Peck, Gibson and Dooley, JJ., and Barney, C.J. (Ret.), Specially Assigned**

Opinion Filed September 16, 1988

*Jeffrey L. Amestoy, Attorney General,* and *Susan R. Harritt, Assistant Attorney General,* Montpelier, for Plaintiff-Appellant.

*Kimberly B. Cheney, Robert Sheil,* and *Ken Messing and Karen Golden, Law Clerks (On the Brief),* Montpelier, for Defendant-Appellee.

**Allen, C.J.** The State appeals, pursuant to 13 V.S.A. § 7403(c)(1) and (2) and V.R.A.P. 5(b)(1)(A) and (B), the grant of a motion to suppress statements made to police officers by the defendant following interrogation at police barracks. Defendant is charged with murder in the first degree. 13 V.S.A. § 2301. We affirm.

The unchallenged findings of fact indicate that a state police officer received a call from the Medical Examiner's office advising that a female child had been pronounced dead on arrival at a hospital and that a brief examination revealed signs of physical abuse. The state police officer notified the chief of police of the town where the victim and her parents resided, and the two officers then attended the autopsy of the victim. At the conclusion of the autopsy, they were informed by the physician performing it that the death was a homicide caused by suffocation and severe shaking.

The police officers, based on earlier abuse allegations, suspected that either the defendant or his wife was responsible for the death. They were also aware that the victim had been removed from the home by the Department of Social and Rehabilitation Services, and only recently returned to it.

After learning of the whereabouts of defendant, the officers met with the state's attorney to discuss the investigation. It was agreed at this meeting that they would not take defendant and his wife into custody "so that defendant and his wife could be questioned without being first informed of their *Miranda* rights."

The officers, along with a third state police officer who could assist in locating the home of the parents of defendant where defendant and his wife were visiting, arrived at the parents' home shortly after 10:00 p.m. Present at the parents' home were several of defendant's siblings and their spouses, as well as defendant and his wife.

The officers informed defendant and his wife that the officers were required to investigate the child's death and asked them to go the police station to speak with them about the child's death. One of the state police officers told defendant and his wife that they did not have to come to the police station, but that if they did come he would bring them back home after the interview. Defendant's mother then inquired as to whether they had to go that night. The chief of police answered that they did because he wanted the statement while the events were still fresh in their minds. Defendant's brother requested permission to accompany defendant to the interrogation, but this request was refused. Defendant and his wife then agreed to go. They were taken by police cruiser to the state police barracks, located about a half-hour drive from the parents' home.

Upon arrival at the barracks, they were immediately separated. A state police officer and the chief placed the defendant in a small office, where they began their interrogation at about 10:40 p.m. Defendant was informed at the outset that he was not under arrest or in custody, that he did not have to talk, and that they would give him a ride home when he wanted. Defendant agreed to be interviewed, and at no time indicated his unwillingness to speak with them.

During the course of this interview, and before any *Miranda* warnings were given, defendant, in response to a suggestion by the chief that the death was "accidental," stated that "it was an

accident," and inquired as to whether he was going to jail that night. After being informed that he was not going to jail that night, he made additional incriminating statements. After making these statements, he was read his *Miranda* rights, acknowledged that he understood them, and signed a written waiver of those rights. This took place shortly after midnight. The officers then took a taped statement from defendant, in which he reiterated his earlier statements. At the start of the taped interview, he acknowledged that his presence at the barracks was voluntary, that he knew he was free to leave, and that he had not been subjected to threats or promises, other than the promise that he would be driven home. He was then driven home, leaving the barracks at 12:47 a.m.

Defendant sought to suppress all of the statements made during his interrogation at the barracks, on the grounds that they were taken in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Chapter I, Article 10 of the Vermont Constitution. He contended that he was in custody during the interrogation, and that because the initial portion of the interrogation was not preceded by *Miranda* warnings, the initial statements must be suppressed. He further contended that the subsequent taped statement must also be suppressed because the later warnings were not sufficient to "purge the taint of the initial illegal interrogation."

The trial court concluded that the statements obtained from the defendant had to be suppressed because the defendant was "in custody" within the meaning of *Miranda* v. *Arizona*, 384 U.S. 436 (1966). We affirm.*

■ In our review, we must be guided by certain fundamental principles, the first and foremost being that the trial court's ruling will not be disturbed unless it was clearly erroneous. *State* v. *Harvey*, 145 Vt. 654, 657, 497 A.2d 356, 357 (1985). The State had the burden to establish by a preponderance of the evidence that the confession was voluntary, *Lego* v. *Twomey*, 404 U.S. 477, 489 (1972), and that the defendant knowingly and intelligently waived his Fifth Amendment rights. *State* v. *Clark*, 143 Vt. 11, 12, 460 A.2d 449, 450 (1983). Here, the trial court properly focused on

---

* The trial court's analysis was based only on the United States Constitution. On appeal, neither the State nor defendant raises issues pertaining to the Vermont Constitution.

this Court's statement in *State* v. *Willis*, 145 Vt. 459, 494 A.2d 108 (1985), that:

> [I]n determining when a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way," our courts should make an objective inquiry into the totality of the circumstances to determine if a reasonable person would believe he or she were free to leave or to refuse to answer police questioning.

*Id.* at 475, 494 A.2d at 117 (citation omitted). The trial court concluded that a reasonable person in defendant's shoes under the existing circumstances would not have felt free to leave or to refuse to submit to questioning.

■ The State argues that the legal conclusion drawn from the facts found by the court is erroneous as a matter of law. It contends that the outcome under the Fifth Amendment is dictated by the per curiam holdings of the United States Supreme Court in *Oregon* v. *Mathiason*, 429 U.S. 492 (1977), and *California* v. *Beheler*, 463 U.S. 1121 (1983). In *Mathiason*, a police officer, after attempting to contact the defendant for three or four days without success, left a card at defendant's apartment asking defendant to call. The defendant did call and was asked when it would be convenient to meet. The defendant had no preference so the officer asked if the defendant could meet at the state police office at about 5:00 p.m. This office was about two blocks from the defendant's apartment. They did meet, shook hands, and the defendant was told that he was not under arrest. The interview was over in a half an hour and the defendant left. In summarily reversing the grant of the suppression motion, the United States Supreme Court stressed the defendant's voluntary arrival at the police station, the brief stay, and the casual nature of the entire action. *Mathiason*, 429 U.S. at 494-96. In *Beheler*, the Court held that the defendant had not been in custody during an interview with police and therefore was not entitled to *Miranda* warnings. The Court based its conclusion on the facts that the defendant accompanied the police to the station house, he was informed that he was not under arrest, the interview lasted less than thirty minutes, and the defendant was permitted to leave. *Beheler*, 463 U.S. at 1122-25.

While these cases have factual similarities to this case, the differences justify a different result. Here, defendant was requested

to go to the station, was told that he did not have to go, that he would be brought back after the interview, and agreed to go — but only after his mother had been informed in his presence that he "had" to go that night. While the statements made by the officers may have been contradictory and confusing, it cannot be said on these factual findings that the trial court was wrong, as a matter of law, in concluding that a reasonable person would not believe that he was free to refuse to go to the barracks and answer police questioning that evening. The continued assertions by the officers that he was not under arrest or in custody, pursuant to their plan to avoid having to give *Miranda* warnings, cannot overcome the restriction placed upon defendant's freedom by the statement that he "had" to go that night, the thirty minute ride in the cruiser during the late evening, the refusal to permit his brother to attend, and the lengthy interrogation in a small office by two officers out of the presence of his wife. The totality of these circumstances readily supports the conclusion that a reasonable person would believe he was not free to refuse to go to the barracks and submit to questioning. See *State* v. *Willis*, 145 Vt. at 475, 494 A.2d at 117. The activity described far exceeds the relatively innocuous requests and conduct described in *Mathiason* and *Beheler*. The trial court's conclusion was not erroneous as a matter of law. Accordingly, we affirm.

*Affirmed.*

**Peck, J.,** dissenting. As a brief preliminary statement of my reaction to the majority's decision and opinion in this case, I cannot put it any better than did Justice Holmes dissenting in a 1904 case; he wrote:

> At the present time in this country there is more danger that criminals will escape justice than that they will be subjected to tyranny.[1]

*Kepner* v. *United States*, 195 U.S. 100, 134 (1904) (Holmes, J., dissenting; joined by Justices White and McKenna).

---

[1] Consider also Jeremy Bentham, Rationale of Judicial Evidence, 6 Works 205: "If rogues did but know all the pains the law has taken for their benefit, honest men would have nothing left they could call their own."

I cannot pretend to be blandly dispassionate and removed in the face of the result reached by the trial court and by the majority in this matter, or of the rationale, employed at both levels, in attempting to support it. The majority opinion is socially irresponsible. It is too formulaic and slavishly obeisant before the idol of technicality. I cannot support the decision by concurring in this unfortunate outcome. Accordingly, I must record my dissent and explain my reasons.

We are concerned here with a charge of first degree murder: the slaying of an infant child. The involvement of the defendant-father is not in doubt. He admitted his responsibility to the police, and described graphically his actions which culminated in the death of his small daughter, Abby. There is, of course, no indication at this point of what other evidence of culpable responsibility, if any, may exist; obviously, however, it must be entirely circumstantial at best. Consequently, even if there is enough to take the case to trial, jurors will be left to speculate as to the merits of the charge. They will be forbidden, by judicial fiat, to consider a known and admitted truth-in-fact, even if they are aware of it through the media or otherwise. They must arrive at a verdict of innocence or guilt in the death of a child by acting out a charade of let's-pretend.

I would not be understood as a champion of egregious actions by the police in the course of a criminal investigation. However, the record is clear that no such conduct occurred here. At all stages of the proceeding the police made a good faith and conscientious effort to comply strictly with the investigative guidelines dictated to them by the courts. A homicide investigation is not a sporting event; it is triggered by an irrevocable *fait accompli*: the extinction of a human life. Today's decision not only ignores, it demeans, the importance of one of the greatest, if not *the* greatest, of all our constitutional rights — the sacred right to life itself.

Chapter I, Article 1 of the Vermont Constitution provides in significant part:

> [A]ll men . . . have certain natural, inherent, and unalienable *rights*, amongst which are the enjoying . . . [of] *life* and liberty . . . and pursuing and obtaining happiness and *safety* . . . . (Emphasis added).

These words are not part of a mere preliminary preamble or policy statement. They are part of an article of the main body of

the Constitution itself; its importance is suggested by the fact that it was chosen by the framers of the document to be the very first of its articles.

As a part of the Constitution, it is a part of the fundamental law of this state. As a part of the fundamental law, it is not only subject to, it is entitled to, interpretation, implementation and enforcement by the courts — most particularly by this Court. It is entitled to a *fair* balancing with every other article. This Court particularly has a social responsibility to *all* the people of Vermont; we are accountable to them for the redress provided when the rights of any one of their number, guaranteed by this article, are violated. What price the life of little Abby Brunell when measured by judicial game-playing?

## I.

### Evidence and the Reasonable Man

The suppression order, and the affirmance thereof by the majority of this Court, turns primarily on the testimony of defendant's mother during the suppression hearing. The transcript of that hearing discloses that the police first encountered defendant and his wife, at the home of the former's parents in Groton, at approximately 10:05 p.m. on the day of the alleged homicide. Also present were several of defendant's siblings and their spouses. One of the police officers, in his testimony at the hearing, characterized the assemblage as a family gathering.

After the police were admitted to the house, they introduced themselves and explained the purpose of their call as being a part of their investigation into the circumstances surrounding the death of Abby Brunell. They asked defendant and his wife if they would agree to accompany the officers to either one of two state police barracks[2] for interviews in connection with their child's death. Both agreed to go with the officers to the St. Johnsbury barracks.

It was at this point that defendant's mother inquired of the officers if they (defendant and his wife) had to accompany the officers that night or whether the interview could not wait until the following day. The response, according to the mother's testi-

---

[2] At St. Johnsbury, the nearest to Groton, or Middlesex, the nearest to defendant's home in Waterbury, as the Brunells might choose.

mony, was to the effect that they had to go that night since whatever information the child's parents might provide would still be fresh in their minds. One of the officers testified that, at that time, the police had no probable cause for an arrest.

I think it is also appropriate to comment, although there is nothing in the record to address the possibility one way or another, that the officers' hope to interview defendant and his wife promptly was not only to seek information while it was still fresh in their minds, but so that if either had any motive for doing so, there would be less time to concoct a false alibi or a fictitious account of the circumstances surrounding their daughter's death. In my view, this is good investigatory procedure. The police might well be criticized if they did not investigate a homicide diligently and promptly; presumably it is part of their job to do just that.

My reading of the transcript and the findings indicates that the trial court lifted the brief interchange between the mother and the police out of context. In the finding next preceding those relating to the mother's inquiry, the court said this:

> [One of the officers] told defendant and his wife that they did not have to come to the police station, but if they did come he would bring them back home after the interview at the police station.

The police repeatedly assured defendant, both at his parents' home and later at the barracks, that his presence, and any answers he might choose to give in response to questions, was purely voluntary, that he could terminate the interview at any time he wished, and thereafter would be returned to his home, as in fact he was, regardless of his admissions, and that he was not under arrest. The evidence is uncontradicted that, even *after* the mother's inquiry, defendant himself indicated he understood all of the above; in fact the advice that he was *not* under arrest was repeated to him at the police barracks itself during the interview.

One of several examples of the uncontradicted evidence of defendant's understanding that he was not in custody or under arrest, and that he was free to terminate the interview and leave at any time, is the following excerpt from the suppression hearing transcript. One of the interviewing officers is testifying on direct examination; the questions and answers relate to the preliminary discussion between police and defendant at the police barracks,

long *after* the mother's inquiry in Groton, but before defendant admitted his responsibility for Abby's death:

Q. Before you spoke to him, did you tell Mr. Brunell that he was not under arrest and not in custody?
A. Yes, I did.

Q. And did he acknowledge . . . that he understood that?
A. Yes, he did . . . I further advised him that we would give himself and his wife a ride home at any time that they requested and that they could terminate the questioning at any time . . . .

Q. Did he indicate to you, at that time, that he wanted to go back to [his parents' home in Groton], and he didn't want to talk to you?
A. No. . . . he agreed to go on with the interview.

(After a discussion of the events prior to the date of the homicide, the pertinent direct examination continued)

Q. During this stage of the interview . . . did he ask to leave at any time?
A. He never did.

. . . .

Q. Did he indicate to you, in any way that he didn't want to answer your questions?
A. He did not.

(Shortly thereafter, defendant told the officers that his daughter's death was an accident. The officer testified that defendant asked if he was going to jail)

Q. Did you tell him whether or not he would be going to jail?
A. I told him he wasn't going to jail that night. I had promised to take him home.

Defendant and his wife were in fact returned to Groton; no arrest occurred until the next day.

Notwithstanding all of these uncontradicted facts, the cornerstone of the trial court's decision, and of the majority opinion, is the affirmative response of the police to the mother's question

whether her son and daughter-in-law had to go with the officers then.

It is clear enough to me that the trial court's interpretation very carefully isolates the officer's response from the context of the surrounding circumstances, trying to justify this approach through a play on the words allegedly employed by the officer in a spontaneous utterance, as though the speaker should know his statement would be literalized and isolated in a vacuum. It seems that law enforcement officers are expected to be thoroughly familiar with all the possible nuances attributable to every word they speak. They will then be so finely honed in their speech abilities that they will be able to respond with the unassailable accuracy of a linguistic pedant under even the most harrowing and unpredictable conditions and circumstances.

In the context of the discussions between the officers and the defendant and his wife preceding the mother's inquiry, which the trial court ignored, it is manifest, even through the cold printed medium of the transcript, that the officer's response had no more sinister meaning or implications than that, if the couple agreed to accompany the police voluntarily, it should be that night while the circumstances surrounding Abby's death, to the extent of any knowledge they might have, were as fresh in their minds as passing time would permit.

There was no change in the demeanor or attitude of the officers towards Mr. and Mrs. Brunell, no revocation of the request that the couple accompany them voluntarily. There were no objections by the couple, following the brief interchange with defendant's mother, nor was there any withdrawal of their agreement to go voluntarily.

Is it not strange and, one would think, significant that defendant himself did not take the stand and testify that he believed himself to be in custody if that was the fact? Instead, of course, he relied successfully on the weakness of the judicial mentality, at both trial and appellate levels, as being enamored of formula as a substitute for thinking and common sense. In short, and colloquially expressed, that famous and fictitious paragon of legal perfection, the "reasonable man," rides again.

The trial judge here, as well, apparently, as the majority, misinterpreted language employed by this Court in *State* v. *Willis*, 145 Vt. 459, 494 A.2d 108 (1985); the judge simply failed to examine and analyze the case in its entirety. In that case, we stated (in

dicta, since the point being examined did not turn on it, nor enter into the resolution of the issue), and the trial judge here seized on the following:

> [I]n determining when a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way," our courts should make an objective inquiry into the totality of the circumstances to determine if a reasonable person would believe he or she were free to leave or to refuse to answer police questioning.

*Id.* at 475, 494 A.2d at 117 (citation omitted).

The objective reasonable-man test is designed as a standard for the measure of conduct when it must be judged primarily, if not solely, by the conduct itself, or on conflicting statements by police and a defendant. There are no conflicts here. It should not be applied in circumstances such as this, where the *uncontradicted* evidence demonstrates clearly that, even *after* the mother's question, after the drive to the barracks, indeed after arrival at the barracks and the separation of defendant and his wife, defendant himself acknowledged his understanding, as the officers told him repeatedly, that he was free to terminate questioning at any time, that he was not under arrest, was free to leave at any time, and would then be returned by the police to his own or his parents' home, as he desired. Later, he signed a written statement, again acknowledging that his admissions were made voluntarily. Thereafter, the couple were driven back to his parents' home, as he requested — still without arrest. Defendant was not arrested nor his movements restricted in any way until late the following morning, and even then after the arrest had been postponed to allow him time to make funeral arrangements for little Abby.

Finally, as noted above, defendant himself did not take the stand to assert that, in fact, he did believe he was in custody, or that he did not actually understand that he was free to terminate questioning or to leave at any time. Such testimony, being in conflict with the evidence given by the police, might at least have been some basis for the reasonable-man test, although deciding credibility of the conflicting testimony is more likely. But that test has no place when the unchallenged and uncontradicted evidence itself answers the question and there is not the slightest basis to doubt its credibility; *Willis* does not suggest otherwise.

Whatever a hypothetical man might believe, under circumstances where that test is the only fair measure, it is inexcusably applied, and grossly unjust to the right of the people to life, liberty, and safety, when a subject's actual belief is clearly established by uncontradicted evidence as was defendant's in this case. When we consider that a determination of such a nebulous and esoteric issue as subjective intent can be resolved by the trier of fact at a trial on the merits, based on a party's statements, conduct, and other evidence, it is preposterous to interpret *Willis* as holding that a suspect's subjective belief as to his custody status cannot be resolved in the same manner, assuming the evidence exists. By maintaining silence at the suppression hearing, although it was certainly his right to do so, he succeeded nevertheless in luring the trial court, and the majority of this Court as well, into an erroneous resort to the reasonable-man test

Proof that the *Willis* objective test was not intended to be applied blindly to all cases lies in the very fact that it was not applied even in that case — the very case in which it was announced. The *Willis* trial court had concluded that the defendant had been in custody at a certain critical point in the police investigation. This Court held that conclusion to be error, not by applying the reasonable-man test, but on the basis of the evidentiary facts, including the questioning and other surrounding circumstances. We held that the defendant had not been in custody even though questioned as a suspect. *Willis* at 476, 494 A.2d at 117-18. In other words, when there are *facts* demonstrating an absence of custody, the speculation and conjecture implicit in the test as applied by the trial court here, and by the majority, are neither necessary nor proper; it is too readily susceptible to the whims and personal leanings of both trial and appellate judges. The facts here, consisting of the repeated assurances to defendant and his own acknowledgments of his understanding, show overwhelmingly that he was never in custody, nor did he believe himself to be, prior to his formal arrest the following day. The wrong standard was applied by the trial court in granting the motion to suppress; this was error.

The objective reasonable-man test may have a particular significance in the so-called "chase" or "pursuit" cases under the seizure clause of the Fourth Amendment, to which it is more commonly applied. See *Michigan* v. *Chesternut*, 486 U.S. 567, 108 S. Ct. 1975 (1988). It is the only standard available in the great ma-

jority of these cases. It is hardly to be expected that someone, trying to elude approaching or following police, will pause in midflight to announce his custody/restraint perceptions. Seldom will there be sufficient communications between pursuer and pursued, or other evidence, to support the application of a subjective standard. That is not the case here; moreover, we are concerned in this matter with the privileges against self-incrimination guaranteed by the Fifth Amendment.

One of the inexcusable ironies of the decision mandating the objective test is its creation of yet another loophole through which wrongdoers will escape the consequences of even the most heinous crimes. Heaping Pelion upon Ossa, today's result ascends to new heights, awarding to criminals a right to *force* the State and the trial courts to apply the reasonable-man standard, regardless of the Supreme Court's characterization of the test as "necessarily imprecise," *id.* at 573, 108 S. Ct. at 1979, even in the face of clear and unchallenged evidence of the subjective fact. The criminal accomplishes this judicially blessed distortion of justice by the simple expedient of keeping his mouth shut at the suppression hearing and figuratively thumbing his nose at the people, his victims, and law enforcement; this Court, in the meantime, bestows a benevolent and avuncular pat upon his head. To say that this is the meaning of our Constitution is interpretation running wild; it demeans logic and common sense.

## II.

### Precedent Overruled

Approaching the majority's unfortunate keystone, the mother's testimony, from another perspective, the reliance on that testimony produces a result in conflict with the recent ruling by this Court in *State* v. *Noble*, 148 Vt. 615, 538 A.2d 162 (1987), which, incidentally, supersedes *Willis* by more than two and a half years.

*Noble* involved a motion to suppress the results of a breath test and inculpatory statements made by the defendant at the police station in a DUI case. In support of his motion, defendant claimed that the test and statements were the product of an illegal arrest. At the site of the accident which precipitated the police action, the investigating officer administered preliminary dexterity tests to the defendant and concluded that the latter was under the influence of intoxicating liquor. At that point, the of-

ficer said to the defendant, "I'm afraid that I'm going to *have* to ask you to come down to the station to take a crimper test." (emphasis added). As in the case before us today, the defendant agreed to go with the officer and did so. The defendant's argument in *Noble* might be considered even stronger than it is here; the officer's statement was made directly to the suspect, not to a third person.

Notwithstanding the mandatory import of the officer's statement to the defendant, this Court said:

> The record . . . fails to disclose any evidence of involuntariness of coercion beyond the coercive elements which may exist " 'simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.' "

*Id.* at 616, 538 A.2d at 163 (citing, of all cases, *State* v. *Willis*, 145 Vt. at 472, 494 A.2d at 115, and quoting the United States Supreme Court in *Oregon* v. *Mathiason*, 429 U.S. 492, 495 (1977)). Again — and just a year ago — there was no invocation of any reasonable-man test; the question was decided on cold facts as disclosed by the evidence.

Further, in *Willis*, this Court did not wash its hands of responsibility by hiding timorously behind the "discretion" of the trial court as does today's majority. We decided the custody issue in that case *on the record facts* and held that the trial court's finding of custody was error. Considering the age of the *Willis* defendant, a boy in his middle teens, and his lack of any previous experience with the police or the law, it could be argued, with some force, that a reasonable person of his years and lack of sophistication might believe himself in custody, as the trial court had decided.

In this case, the evidence of defendant's understanding was persuasive and totally uncontradicted; it was based entirely on his own acknowledgements, not on any subjective beliefs of the police. It is true that the testimony concerning defendant's admissions came entirely from the investigating officers, but it was accepted by the court; there was no question as to the credibility of the testimony, as the court's findings show. For these reasons, the custody holding was error as a matter of law, to the same extent it was in *Willis*. To the extent it was a discretionary ruling, it was an abuse of discretion.

I do not recognize the applicability of the reasonable-man test under the facts of this case. Nevertheless, even if it is assumed the test is appropriate, the result should not change. Given the repeated assurances given defendant at all stages, no reasonable man could believe he was in custody, and not free to decline to answer any questions, to terminate the interview and to leave at any time he wished.

I would point out also that in this case, even after the officer's response to the mother's inquiry, neither defendant nor his wife, who had already agreed to go with the police voluntarily, said or did anything to indicate an objection, or that they had changed their minds as to the basis on which they were accompanying the officers; they went willingly. Nor did the refusal of the officers to permit defendant's brother to accompany them change anything. Neither one asked that the brother be allowed to go with them, nor did they protest when the police declined the brother's request.

Once the majority's keystone crumbles, as it does in the light of *Willis*, when carefully analyzed, and of *Noble*, the irrelevance of the factors cited by the majority are revealed for what they are — mere cumulative hype. Let us examine the merits of these factors.

First, defendant and his wife were taken to the state police barracks at St. Johnsbury, a time-distance from Groton of approximately half an hour. To read the majority opinion, one would think the two were transported in irons to the west coast. The distance was not excessive by any stretch of the imagination. Be that as it may, both knew where they were going before they started; in fact they were given a choice between the St. Johnsbury or the Middlesex barracks. There is nothing to indicate that their original agreement, to accompany the police voluntarily, changed in any way because of the facilities to which they were to be taken. They went without the slightest protest, with foreknowledge of where they were going. Nor, at any tine, was defendant (or his wife) handcuffed or restrained in any way; in fact, they sat alone in the back seat of the vehicle. Cf. *State* v. *Baldwin*, 140 Vt. 501, 438 A.2d 1135 (1981), in which the suspect, later the defendant, in a DUI prosecution, was transported *over his protest*, from one town to another for purposes of testing. Regardless of his protest, the trial court, and this Court in affirmance, found that ultimately he went "voluntarily" notwithstanding his known and expressed objection; no reasonable-man test

was applied and denial of a motion to suppress was upheld by this Court. *Id.* at 506-07, 513, 438 A.2d at 1138. In this case there was not even an initial protest or objection by defendant to going with the officers.

The second and third factors can be answered on similar grounds. I refer to the facts that defendant's brother was not allowed to accompany them to St. Johnsbury, and that defendant and his wife were interviewed separately. I am inclined to exclaim in amazement: "For heavens sake! The police were not investigating a raid on a cookie jar by a pair of roguish five year olds!" They were investigating one of the most outrageous and brutal crimes known to the criminal code; the defendant has been charged with murder in the first degree of his own infant child. Such an investigation is not a tea party, to which the whole family of a possible suspect must be invited, or allowed to attend, for small talk and petit fours. I submit that it is logical and entirely proper procedure for investigating officers to separate possible suspects and potential witnesses for purposes of preliminary interrogation.

Interviewing separately those who may be involved in a crime, or have some knowledge thereof, may well have the salutary result of unmasking conflicting stories, falsehoods, inaccuracies, bogus alibis and the like. It precludes coaching and interruptions, as well as any quickly interposed response to a question by a person other than the one to whom the inquiry is directed.

The next factor condemned by the majority is its complaint that the interview with defendant lasted an inordinate amount of time. This is simply not true as a practical matter, given the seriousness of the probable crime under investigation. The interview with defendant at the St. Johnsbury barracks began at 10:41 p.m. It reached the point at which the *Miranda* warning was read to him at 12:02 a.m., or a total time of one hour and twenty-one minutes. It is only by an obvious effort to make much out of nothing that this can be characterized as an inordinate or unreasonable period of time. The questioning was polite; it was not threatening or abusive. In fact, the uncontradicted testimony discloses that a fair percentage of the time was devoted to a discussion of occurrences during the two days prior to the child's death and on the final day up to the time of death. Moreover, that discussion uncovered nothing inculpatory to the defendant until he disclosed sufficient knowledge to assert that Abby's death was "an

accident." Defendant himself conceded in writing signed by him that he came with the police voluntarily; he acknowledged his understanding that he was not under arrest, and that he could leave at any time; that he had not been subjected to any threats or promises (other than the police "promise[d] that you'd take me home," which was done). His reference to this "promise," which was fulfilled, is a clear recognition that he did not consider himself as in custody or under arrest.

The actual impact on defendant of the factors, relied on by the majority as contributory, is exposed as the phantasm it is by his own acknowledgements after they had occurred.

## III.

### Recapitulation

The trial court erred in the standard applied to the custody issue. Moreover, the evidence was overwhelming, particularly in the absence of any denial by defendant of the officers' testimony. Defendant was told repeatedly, both before and after the mother's inquiry, that he did not have to go, that he was not under arrest, that he could terminate the interview at any time, and would be taken home regardless of anything that happened.

Defendant indicated his understanding of these assurances and acknowledged the voluntariness of his participation, both before and after he was read his *Miranda* rights — which he waived expressly. He was never arrested, i.e., in custody. At one point he even asked specifically if he was under arrest and was told again he was not. He was returned to his parents' home without any restraints whatever placed on his liberty of movement; indeed he might have left the jurisdiction with impunity. He was not in custody and the evidence is unimpeachable that he never believed he was, nor was he given any cause for such a belief.

If there is insufficient evidence to make a factual determination, it may, in a given situation, trigger the reasonable-man test . On the other hand, if, as is the case here, the defendant's understanding can be determined by his own acknowledgements, it is error to rely on the test. The officers' factual testimony was accepted at face value by the trial court and much of it incorporated into the findings, its credibility not questioned.

After what must be hundreds of pages, written over a period of many years, lauding the ability and the right of triers of fact,

court or jury as the case may be, to base conclusions on evidentiary facts, the majority suddenly abandons this established and sound principle, and substitutes in its place a test, highly speculative at best, and "necessarily imprecise." The majority should be less concerned with carving out a niche for itself in judicial history, and give more attention to logic, common sense, and the concerns of our people in the face of an ever-increasing rate of violent crime against the person. The public expects better from its courts than today's result. It is little wonder that there is a noticeable diminution of respect for the courts, particularly in criminal matters, and suspicion of the technicalities, wrapped in a cloak of questionable constitutional interpretations, which greatly facilitate the efforts of criminals to escape the deserved consequences of their conduct. Law enforcement authorities are so harassed by the courts with technicalities and fine lines that it is a wonder to me they perform as well as they do.

Today's decision frustrates and hampers investigative procedures even more than do the already broad existing requirements. Uncertainty in the investigation of even the most serious crimes has been expanded enormously. The majority has brought us to the point at which it is problematical whether the police will ever dare to interrogate suspects and potential witnesses at police offices because the station house setting alone will always have some potential for intimidation. The blanket application of the reasonable-man test required by the decision must, almost necessarily, result in suppression in a great majority of cases from minor traffic violations to assaults, child abuse, sex crimes and the most callous and brutal homicides. The likelihood of a suspect being able to "get away with murder," literally, has been enlarged substantially. Thus has the majority responded to its social responsibility.

It seems to me that when an admission of culpability is the result of an investigative interrogation, the rights of the people under Chapter I, Article 1 of the Vermont Constitution should be construed to require suppression only under patently egregious circumstances and the closest scrutiny, applying the reasonable-man test for determining the custody issue only when it is the sole option available. And certainly not in cases where police credibility is not in question, and the defendant himself acknowledges his status.

Finally, I do not understand the United States Supreme Court decisions which discuss it, such as *Chesternut,* to hold that application of the reasonable-man test is constitutionally required even in pursuit cases. This makes the majority's position, mandating the test in *all* cases regardless of the evidence, unnecessary, and all the more incomprehensible considering the inevitable consequences.

The majority has slapped the police in the face by today's decision, and seriously impeded legitimate criminal investigation. It has substituted formula for thinking, and failed in its social responsibility and obligation to the people of the state under the Vermont Constitution. On the strength of overwhelming and uncontradicted evidence, defendant was never in custody as a matter of law. I would remand and direct the trial court to deny suppression in light of the facts and precedential decisions such as *Willis, Noble, Baldwin* and others which are implicitly overruled and buried by today's decision.