# State of Vermont v. Lance Stanislaw

[573 A.2d 286]

No. 88-131

Present: Allen, C.J., Peck, Dooley and Morse, JJ., and Barney, C.J. (Ret.), Specially Assigned

Opinion Filed January 26, 1990

*Shelley A. Hill,* Windsor County State's Attorney, and *Mark T. Cameron,* Deputy State's Attorney, White River Junction, and *Adele V. Pastor,* Department of State's Attorneys, Montpelier, for Plaintiff-Appellee.

*Peter F. Langrock* and *Anna E. Saxman* of *Langrock Sperry Parker & Wool,* Middlebury, for Defendant-Appellant.

**Allen, C.J.** The defendant is charged with involuntary manslaughter for committing the unlawful act of furnishing a minor with alcohol, in violation of 7 V.S.A. § 658, thereby causing her death. Following his arraignment, defendant moved to dismiss on the grounds that the information failed to charge an offense and that his warrantless arrest without probable cause violated his rights under the United States and Vermont Constitutions. He also moved to suppress statements he made to the investigating officers. The trial court denied the motions and granted an interlocutory appeal. We affirm.

According to the affidavits of probable cause filed with the information, a minor arrived at a party with a fifth of Bacardi 151 Rum in her possession. She drank heavily from the fifth of rum and left the party with four friends. After leaving the party, the minor "passed out" near Artistic Woodworks, a business owned and operated by defendant. One of the minor's friends asked defendant if they could leave her in defendant's office because it was cold outside. Defendant replied that they could, but they were to come back to check on her. The friends placed the minor inside Artistic Woodworks, where she later succumbed to alcohol poisoning. At the time of her death, approximately one-fourth of the liquor remained in the bottle. The accompanying affidavit also alleged that on the day of the party a witness saw the minor, in search of liquor, approach a man the witness believed to be the defendant and that a liquor store

employee recalled selling a fifth of Bacardi 151 Rum to defendant on the same evening that the foregoing events took place.

On February 5, 1987, two Vermont State Police detectives drove to Artistic Woodworks and arrested the defendant without a warrant. The arresting officers testified at the hearing on the motion to suppress that some of defendant's co-workers were present at the time of the arrest and one said that a lawyer would be contacted. The defendant did not respond to this statement. The officers testified they placed defendant in the police cruiser and administered *Miranda* warnings. The defendant subsequently gave both oral and written statements to the police. The State filed an information on the following day charging defendant with involuntary manslaughter.

Defendant contends dismissal is required because the information failed to charge an offense and the officers arrested him without probable cause. Defendant argues for the suppression of all post-arrest statements made to the police on the grounds they were not given voluntarily and were taken in violation of his right to counsel.

The trial court ruled that involuntary manslaughter requires merely an involuntary act with death resulting, and that the State was not required to charge or prove a mental element of recklessness or negligence. The trial court concluded the information sufficiently charged the offense and denied defendant's motion to dismiss. In addition, the trial court ruled the information and affidavit set forth facts adequate to support a finding of probable cause to believe defendant committed the unlawful act of furnishing a minor with alcohol, thereby causing the victim's death. These facts, according to the trial court, gave the police probable cause to arrest and charge the defendant with manslaughter. The trial court further held that the defendant's arrest did not require a warrant because it was made at a public place of business. The trial court, therefore, denied defendant's second motion to dismiss.

The trial court also refused to suppress any of defendant's post-arrest statements to police. The court found that defendant failed to invoke his right to counsel, that defendant volun-

tarily, knowingly and intelligently waived his *Miranda* rights, and that he provided the police with a voluntary confession.

The defendant then moved for an interlocutory appeal pursuant to V.R.A.P. 5(b). The trial court granted the motion and the following questions of law were certified to this Court:

> 1. Are the information and affidavit of probable cause, alleging the strict liability crime of illegal act involuntary manslaughter (providing liquor to a minor with the death of the minor resulting) legally valid in Vermont?
>
> 2. Should defendant's statements to the police be suppressed as the product of an illegal arrest under the United States and Vermont Constitutions?
>
> 3. Should defendant's statements to the police be suppressed as taken in violation of defendant's right to counsel under the United States and Vermont Constitutions?
>
> 4. Should defendant's statements to the police be suppressed as involuntarily made under the United States and Vermont Constitutions?

## I.

The State asserts that involuntary manslaughter occurs where an individual unintentionally causes the death of another by the commission of an unlawful act. The prosecution, according to the State, must prove only the intent required for the illegal act and need not show any intent to commit manslaughter. Therefore, one who engages in an unlawful act bears the burden of strict criminal liability for any deaths caused by the act. Criminal liability follows regardless of whether the underlying illegal act constitutes a felony, misdemeanor, or regulatory violation, and even where the act itself is a strict liability offense. We disagree. "The flaw in the concept is that a person may be convicted of unlawful-act manslaughter even though the person's conduct does not create a perceptible risk of death." *State v. Pray*, 378 A.2d 1322, 1324 (Me. 1977).

The information charged defendant with the violation of 13 V.S.A. § 2304, which provides: "A person who commits manslaughter shall be fined not more than $3000.00, or imprisoned

for not less than one year nor more than 15 years, or both." The statute establishes only the punishment for manslaughter. It does not specify the required intent or any other element of the offense. The absence of an intent element, however, does not end the inquiry. "When the Legislature is silent as to the mens rea required for a particular offense, this Court will not simply assume that the statute creates a strict liability offense, but will try to determine the intent of the Legislature." *State v. Francis*, 151 Vt. 296, 307, 561 A.2d 392, 398 (1989) (quoting *State v. Audette*, 149 Vt. 218, 221, 543 A.2d 1315, 1317 (1988)).

To decide whether the Legislature intended to impose strict criminal liability, we turn first to the common law, for we presume the Legislature has acted "against the background of our traditional legal concepts which render intent a critical factor." *United States v. United States Gypsum Co.*, 438 U.S. 422, 437 (1978). Vermont common law recognized the crimes of involuntary and voluntary manslaughter. See *State v. Center*, 35 Vt. 378, 383 (1862); *State v. McDonnell*, 32 Vt. 491, 516 (1860). This Court has repeatedly referred to involuntary manslaughter as a "killing caused by an unlawful act, but not accompanied with any intention to take life." See *State v. Norton*, 147 Vt. 223, 233, 514 A.2d 1053, 1060 (1986); *State v. Poirier*, 142 Vt. 595, 598, 458 A.2d 1109, 1111 (1983). The trial court read this statement as dispensing with any mens rea requirement. As the context of earlier decisions makes clear, however, the statement merely serves to distinguish involuntary from voluntary manslaughter, which requires a specific intent to kill. See *In re Estate of Mahoney*, 126 Vt. 31, 35, 220 A.2d 475, 478 (1966); *McDonnell*, 32 Vt. at 517. Therefore, our common law precedents do not establish what level of intent, if any, in the commission of the underlying unlawful act is necessary to sustain a conviction for involuntary manslaughter.

We must turn to general principles from which the material element of a crime can be derived. "It is well established that at least with crimes having their origin in the common law, intent generally remains an indispensable element of a criminal offense." *State v. Day*, 150 Vt. 119, 122, 549 A.2d 1061, 1063 (1988). Therefore, in the absence of an express contrary indica-

tion from the Legislature, we must assume involuntary manslaughter as defined by 13 V.S.A. § 2304 implicitly contains an element of mens rea. *Audette*, 149 Vt. at 221, 543 A.2d at 1317.

The mens rea component of a crime embodies "one of the criminal law's most basic principles: a person is not criminally liable for causing a bad result if he or she did not have some culpable mental state with respect to that result." *State v. Doucette*, 143 Vt. 573, 580, 470 A.2d 676, 681 (1983). Therefore, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis v. United States*, 341 U.S. 494, 500 (1951). When presented with questions of statutory interpretation similar to those at issue here, this Court has recognized the fundamental importance of mens rea and applied the general rule that "[u]nless expressly provided otherwise by the legislature, . . . a crime is composed of an act and an intent, which concur at a point in time." *Audette*, 149 Vt. at 220, 543 A.2d at 1316 (quoting *State v. Hanson*, 141 Vt. 228, 232, 446 A.2d 372, 374 (1982) (citations omitted)). We have implied guilty intent as an element when none was expressly written in the statute. See *State v. Francis*, 151 Vt. at 307–09, 561 A.2d at 399 (assault and robbery); *State v. Day*, 150 Vt. at 123, 549 A.2d at 1064 (implying general intent element to crime of operating a vehicle without owner's consent); *Audette*, 149 Vt. at 222, 543 A.2d at 1316 (kidnapping); *Hanson*, 141 Vt. at 232, 446 A.2d at 374 (larceny). But see *State v. Roy*, 151 Vt. 17, 27, 557 A.2d 884, 891 (1989) (strict liability offense to attempt to elude a police officer); *State v. Kerr*, 143 Vt. 597, 604–05, 470 A.2d 670, 674 (1983) (no implicit scienter element in crime of carrying a weapon while committing a felony).

The severity of punishment for the crime is the most important factor[1] to examine for "'the greater the possible punishment, the more likely some fault is required; and, conversely,

---

[1] The other factors considered in order to determine whether the Legislature intended to create a strict liability offense include: "the seriousness of the harm to the public; the defendant's opportunity to ascertain the true facts; the difficulty of prosecution if intent is required; and the number of prosecutions expected." *State v. Roy*, 151 Vt. at 25, 557 A.2d at 889–90.

the lighter the possible punishment, the more likely the legislature meant to impose liability without fault.'" *Audette*, 149 Vt. at 222, 543 A.2d at 1317 (quoting 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.8(a), at 343 (1986) [hereinafter LaFave & Scott]). Involuntary manslaughter carries a maximum penalty of 15 years. 13 V.S.A. § 2304. The Legislature could not have intended to subject a person to a sentence of this duration without requiring the State to show that the defendant bore some fault in causing the death of another.

Having rejected the State's argument that 13 V.S.A. § 2304 imposes liability without fault, we still must decide on the degree of mens rea required for the crime of unlawful act involuntary manslaughter. With respect to involuntary manslaughter, we reject at the outset any attempt to distinguish between acts malum prohibitum and acts malum in se. In jurisdictions that employ this distinction, one who commits an act malum in se may be guilty of manslaughter without regard to the likelihood of the victim's death or to the existence of any causal connection between the death and the conduct's unlawful excess, that is, the portion of the whole conduct that renders the act unlawful. 2 LaFave & Scott § 7.13(c), at 291. When the conduct causing death is malum prohibitum, the actor is guilty only if the death is the natural and foreseeable consequence of the unlawful conduct or, in some jurisdictions, is caused by the conduct's unlawful excess. *Id.* at 292–94.

Given the difficulty of classifying particular crimes, adopting such a distinction would only introduce uncertainty and confusion into this area of law.[2] We also find the classification of acts as malum prohibitum or malum in se unnecessary. Courts will reach "proper conclusions as to liability on the basis of the danger of death or injury involved in the defendant's criminal conduct." 1 LaFave & Scott § 1.6(b), at 48.

---

[2] Classification difficulty suggests the distinction should be abandoned, particularly in homicide and battery cases. 1 LaFave & Scott § 1.6(b), at 48; see also *State v. Hupf*, 48 Del. 254, 265, 101 A.2d 355, 360 (1953) (refusing to adopt the malum prohibitum/malum in se distinction for unlawful act involuntary manslaughter).

■ This Court noted in *State v. Forbes*, 147 Vt. 612, 617, 523 A.2d 1232, 1235 (1987), that either reckless or negligent conduct could sustain a conviction for involuntary manslaughter. Precisely what degree of negligence should suffice has been a matter of debate. The great weight of authority applying a negligence standard, however, requires more than ordinary tort negligence. 2 LaFave & Scott § 7.12(a), at 277–78. We think this is the better view. To sustain an involuntary manslaughter conviction, which imposes up to a 15-year prison sentence, the defendant's conduct must deviate from the standard of care to a greater extent than conduct necessary to subject him to civil liability. "[A] person's criminal liability for an act should be proportioned to his or her moral culpability for that act." *Pray*, 378 A.2d at 1324. We hold that the minimum standard of culpability for involuntary manslaughter under 13 V.S.A. § 2304 is criminal negligence. Defendant must have disregarded a risk of death or injury "'of such a nature and degree that [his] failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a *gross deviation* from the standard of care that a reasonable person would observe in the actor's situation.'" *State v. Watson*, 138 Vt. 276, 280–81, 413 A.2d 806, 808 (1980) (quoting the Model Penal Code definition of negligence § 2.02(2)(d) (1962) (emphasis in original)).[3]

Our ruling regarding the criminal intent requirement of involuntary manslaughter does not, as defendant contends, render the charging information defective. The function of the charging document is to sufficiently inform defendant of the basis and nature of the charge against him, to enable him to prepare a defense. *State v. Roy*, 151 Vt. at 28, 557 A.2d at 891. We test the information according to this standard. The information, like the statute, contained no reference to any required criminal intent or mens rea. This deficiency, however, is not fatal because the information set out the offense in the lan-

---

[3] While the rationale of the Model Penal Code's statutory scheme does not bind this Court, we find this definition of criminal negligence accurately reflects the traditional common law view. See *State v. LaBonte*, 120 Vt. 465, 467, 144 A.2d 792, 794 (1958).

guage of the statute, 13 V.S.A. § 2304, and specifically alleged defendant caused the death of the victim by committing the unlawful act of furnishing alcohol to a minor. The information, therefore, adequately informed defendant of both the charge against him and his alleged acts giving rise to that charge. See *State v. Hurley*, 150 Vt. 165, 171, 552 A.2d 382, 386 (1988) (information silent requiring mens rea sufficient to charge defendant with sexual assault on a minor where statute itself contained no mens rea element and information tracked the statutory language).

The affidavit of probable cause which accompanied the information bolsters our conclusion that the information adequately apprised defendant of the cause and nature of the accusation against him. Fundamental fairness requires that we read these documents together. *State v. Christman*, 135 Vt. 59, 61, 370 A.2d 624, 626 (1977). In this case, the accompanying affidavit alleged that on January 16, 1987 the minor asked a 13-year-old witness if she knew where she could buy some "booze." When the witness replied that she did not know, the minor stated she saw someone who could buy liquor for her. The witness observed the minor walk to the Artistic Woodworks parking lot and approach a man that appeared to be the defendant, with whom the witness was acquainted. The cashier of the liquor store recalled selling a fifth of Bacardi 151 Rum to the defendant on the night in question because the purchaser inquired about the code 621 on the bottle. The affidavit also alleged that witnesses saw the minor depart and return to the party whereupon she produced a fifth of Bacardi 151 Rum and began drinking heavily. The medical examiner informed the police that the minor died from alcohol poisoning, the amount of alcohol she allegedly drank from the bottle of 151 Rum was sufficient to cause death, and the small amount of Motrin she may have ingested did not contribute to her death. The information, when read together with the detailed affidavit, reasonably indicated the alleged illegal act giving rise to the exact offense charged and thereby enables the defendant to intelligently prepare his defense.

Defendant asserts that the failure of the information to refer to acts malum in se, foreseeability, and proximate cause renders it fatally defective. These arguments are without merit in light of our ruling regarding the mens rea element of involuntary manslaughter.

Illegal act involuntary manslaughter does not constitute a strict liability crime. The information and affidavit are, however, legally sufficient.

## II.

Defendant contends his arrest violated the Fourth Amendment of the United States Constitution and Article 11 of the Vermont Constitution because the State failed to establish probable cause to arrest. We do not agree. "[W]hether [an] arrest is constitutionally permissible turns on whether, at the time of arrest, the police officers have probable cause." *State v. Meunier*, 137 Vt. 586, 588, 409 A.2d 583, 584–85 (1979). The concept of probable cause is a practical, nontechnical one that we evaluate in a common sense manner. *Id.* at 589, 409 A.2d at 585. Probable cause exists where the arresting officer has knowledge of facts and circumstances "'sufficient in themselves to warrant a [person] of reasonable caution [to believe] that' the defendant has committed or is in the process of committing a felony." *Id.* (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)); see also V.R.Cr.P. 3(a).

The affidavit and testimony of the police officers clearly indicate the police had probable cause to arrest defendant. The arresting officer's knowledge of facts and circumstances at the time of arrest linked defendant to the minor's procurement of the alcohol which caused her death. These facts and circumstances were sufficient to warrant a reasonable and prudent person to conclude defendant had committed involuntary manslaughter by unlawfully furnishing a minor with alcohol with death resulting.

Defendant also argues that his warrantless arrest in his place of business violated the United States and Vermont Constitutions. We do not reach this issue because the defendant did not raise this argument before the trial court. "Ordinarily, an issue

raised for the first time on appeal is not eligible for review." *State v. Nash*, 144 Vt. 427, 433, 479 A.2d 757, 760 (1984). Even when the defendant asserts a violation of constitutional rights, failure to promptly raise the issue before the trial court results in a waiver. *State v. Gilman*, 145 Vt. 84, 88, 483 A.2d 598, 600 (1984).

■ Defendant argued in the motion to suppress that because the police failed to comply with the *Miranda* requirements, his statements were given involuntarily and were "tainted by an earlier illegality." While the defendant argued before the trial court that the arrest was illegal, the illegality asserted was the lack of probable cause and not the failure to obtain a warrant before arresting defendant in his business premises. Nowhere at the trial level did defendant claim that the constitution compelled the police to obtain a warrant before arresting defendant at his place of business. To decide defendant raised the illegality of the warrantless arrest of defendant in his business premises, we would have to find defendant met his burden by merely asserting an earlier illegality tainted the arrest. We decline to do so. In light of the record's silence, the motion simply lacked the necessary particularity to inform the trial court of the grounds for suppression, and as a result, defendant waived this argument. See *State v. Byrne*, 149 Vt. 257, 260–61, 542 A.2d 667, 669 (1988) (defendant's motion at close of the State's case to strike all of the State's evidence because the "stop was basically illegal" insufficient to preserve for appeal contention that the police violated defendant's right to consult with an attorney before he refused a breath test).

■ ■ Lastly, defendant argues the arrest was illegal because the police failed to bring defendant before a judicial officer without unnecessary delay in violation of V.R.Cr.P. 3(b). The assertion in the motion to suppress regarding the taint of an earlier illegality represents the record's sole reference to this issue. The lack of specificity of the motion again effects a waiver and precludes its consideration on appeal. The second certified question is answered in the negative.

## III.

The third certified question asks whether the police violated defendant's right to counsel, thereby mandating suppression of defendant's statements to the police. This question is answered in the negative because defendant failed to invoke his right to counsel.

The State bears a heavy burden in showing a waiver of *Miranda* rights. *State v. Malinowski*, 148 Vt. 517, 520, 536 A.2d 921, 923 (1987). The trial court must determine the weight and sufficiency of the evidence and the credibility of witnesses. We "have also indicated great deference to the trial court's findings under the totality of circumstances approach." *Id.* In matters regarding the invocation and waiver of *Miranda* rights, we will uphold trial court rulings that are not clearly erroneous and that are supported by credible evidence, even though inconsistencies or substantial evidence to the contrary may exist. *State v. Harvey*, 145 Vt. 654, 657, 497 A.2d 356, 357 (1985).

The police arrested defendant in the Artistic Woodworks workshop in the presence of some friends and co-workers. The trial court found that "someone in the defendant's place of business said they would contact a lawyer for him." Defendant, however, made no response to this statement and accompanied the police officers to the police cruiser outside. Immediately upon entering the cruiser, the arresting officer advised defendant of his *Miranda* rights, including his right to counsel. Defendant indicated he understood those rights and agreed to talk to the officers. Subsequently, defendant gave an oral statement in the cruiser and a written statement at the police barracks. After defendant completed the written statement, defendant's attorney called the police barracks and was given immediate private access to his client. The trial court ruled that the police did not violate defendant's right to counsel and defendant waived his rights voluntarily, knowingly, and intelligently.

Defendant contends the police violated the rigid prophylactic rule of *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981), which holds, once an accused in custody has "expressed his desire to deal with the police only through counsel [the accused] is not subject to further interrogation ... until counsel has been made

available to him," or until he initiates further discussion with the police and executes a valid waiver of his earlier request for counsel.

Resolution of the issue turns on whether defendant invoked his right to counsel by his silence in the face of another's statement that a lawyer would be called. If this one-sided exchange was an invocation of the right to counsel, the questioning of defendant was illegal under *Edwards*. "Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." *Smith v. Illinois*, 469 U.S. 91, 98 (1984). The court must first ascertain whether the "accused 'expressed his desire' for, or 'clearly asserted' his right to, the assistance of counsel." *Id.* at 95 (quoting *Edwards*, 451 U.S. at 484–85). Defendant did not indicate in any manner that he wished to consult with an attorney before speaking. Consequently, the defendant did not invoke the right to counsel, and the police need not have waited for defendant to initiate further discussion.

We cannot say that the person who stated an attorney would be called invoked defendant's right to counsel. "Nothing in the *Miranda* opinion or in succeeding cases has indicated that the right to counsel may be asserted by anyone other than the accused. . . . [T]he principles of *Miranda* place the assertion of the . . . right to counsel upon the accused, and not upon benign third parties . . . ." *State v. Burbine*, 451 A.2d 22, 28 (R.I. 1982) (accused's sister did not invoke the accused's rights by contacting an attorney without the accused's knowledge).[4] Because the bystander did not invoke defendant's Fifth Amendment right to counsel, the police could permissibly initiate further discussion about the case with defendant.

Defendant also argues that his removal to the police cruiser after the bystander said an attorney would be called contravenes the right to counsel under *Maine v. Moulton*, 474 U.S. 159, 170–71 (1985). Reliance on *Moulton*, however, is inappropriate. That case concerned the Sixth Amendment right to

---

[4] The decision of the Rhode Island Supreme Court was ultimately upheld in *Moran v. Burbine*, 475 U.S. 412 (1986).

counsel, which does not attach until adversary judicial proceedings have begun. *Id.* Once the Sixth Amendment right has attached, the police may not circumvent the right to counsel nor interfere with the efforts of defendant's attorney to act as a medium between the accused and the State during interrogation. *Id.* at 176. The Supreme Court clearly explained, however, that the protections of the Sixth Amendment right to counsel do not apply to "interrogation sessions that . . . [take] place *before* the initiation of 'adversary judicial proceedings.'" *Moran v. Burbine*, 475 U.S. at 428 (emphasis in original). At the time the officers interrogated defendant, the State had not yet initiated formal charges. Therefore, no violation of defendant's Sixth Amendment right to counsel took place.

We also reject defendant's argument that the possibility that defendant may have heard the statement that a lawyer would be contacted distinguishes this case from *Moran v. Burbine*. In *Moran*, the accused was unaware at all times of his sister's procurement of an attorney and of the attorney's fruitless attempts to contact him at the police station while accused underwent custodial interrogation. *Moran v. Burbine*, 475 U.S. at 417. The U.S. Supreme Court reasoned that such information, while perhaps useful to the accused, was not necessary to his decision to speak or stand by his rights. *Id.* at 422. "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and *request* a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.* at 422–23 (emphasis added). Defendant knew he could remain silent and request a lawyer. The police advised defendant of his *Miranda* rights within minutes of the bystander's statement. If defendant heard the remark, it only supports the conclusion that defendant validly waived his *Miranda* rights knowing an attorney was his for the asking. Compare *id.* with *Escobedo v. Illinois*, 378 U.S. 478, 481 (1964) (excluding confession where the police incorrectly informed the accused that his lawyer did not want to see him).

## IV.

The final certified question asks whether the United States and Vermont Constitutions demand suppression of defendant's statements to the police as involuntarily made. Defendant argues that a police officer's statement to defendant in the police cruiser critically impaired his capacity for self-determination and amounted to the use of unlawful psychological pressure to extract a confession. We disagree.

The two police officers arrested defendant, escorted him to the police cruiser and immediately gave the *Miranda* warnings. Defendant indicated he understood each of his rights and desired to talk to the police. Before discussing the case directly, the officers and defendant engaged in "small talk" as they drove to the police barracks. During this time, a police officer remarked in reference to the defendant that "it's not like being a real criminal." Later, in response to direct questions from the police officers, defendant gave an oral confession in the police cruiser and a written confession at the police barracks. The trial court found defendant to be a competent individual who had attended college and taught high school and that his confessions were not the product of inducement or threat.

A reviewing court must examine the totality of the circumstances to determine whether defendant's statements were voluntarily given. Voluntary confessions are:

> the product of a rational intellect and the unfettered exercise of free will. A law enforcement official may not use threats, improper influence, or physical or psychological pressure to extract a confession. The ultimate question is whether the pressure, in whatever form, was sufficient to cause the [defendant's] will to be overborne and his capacity for self-determination to be critically impaired.

*State v. Zehner*, 142 Vt. 251, 253–54, 453 A.2d 1126, 1127 (1982) (citations omitted). "[T]he trial court's findings must stand if they are supported by substantial credible evidence and are not clearly erroneous." *Malinowski*, 148 Vt. at 520, 536 A.2d at 923.

Credible evidence supports the trial court's ruling that the police officers obtained a voluntary, knowing and intelligent

waiver of defendant's *Miranda* rights and did not threaten, coerce or induce defendant's subsequent statements. The effect, if any, of the police officer's statement to one charged with involuntary manslaughter that "it's not like being a real criminal" does not detract from the finding that defendant is a competent, well-educated adult, who understood the serious nature of the charge against him. Viewed in the context of the totality of the circumstances, we cannot say the officer's isolated remark amounted to improper psychological pressure, nor that defendant's will was overborne. Defendant exercised his own free will in deciding whether to confess. Therefore, defendant's oral and written confessions were given voluntarily.

*The information and affidavit are legally sufficient. The second, third, and fourth certified questions are answered in the negative.*