# State of Vermont v. Richard D. Caron

[586 A.2d 1127]

No. 89-329

Present: Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.

Opinion Filed December 21, 1990

*Jeffrey L. Amestoy,* Attorney General, and *Susan R. Harritt,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Walter M. Morris, Jr.,* Defender General, and *Anna E. Saxman,* Appellate Defender, Montpelier, for Defendant-Appellant.

**Dooley, J.** Defendant Richard Caron entered a conditional plea of guilty to a burglary charge and was sentenced to four to thirteen years of imprisonment. Defendant appeals the trial court's denial of his motion to suppress evidence, claiming that the evidence was obtained pursuant to an illegal arrest. Defendant also appeals the denial of his motion to suppress statements, claiming that statements and his waiver of his constitutional rights were obtained in violation of the Vermont Constitution and that the waiver of his right to counsel violated the requirements of the Vermont Public Defender Act, 13 V.S.A. § 5237. We affirm.

I.

On December 13, 1987, at approximately 11:40 p.m., the Bennington Police Department received a call from Mary Flanders, reporting that she and her husband had been robbed and assaulted in their Bennington home. Police officers were dispatched to the Flanders' home, where the Flanders told them that two men had entered their home, beaten them, and robbed them of a safe and a pocketbook. Mrs. Flanders stated that one of the assailants was named "Gary." The police department also received a call from Donald Mears, who described seeing and hearing an older model pickup truck pull up and park in front of his home, which was located across the street from the Flanders' residence. According to Mr. Mears, the truck sounded as if it had no muffler, its engine skipped, and it had a cap over the truck bed. Mr. Mears stated that a man exited the truck, stood in front of the Flanders' home for several minutes,

and then returned to the vehicle. The truck drove off, but Mr. Mears heard what he believed to be the same vehicle return and leave several times over the next half hour and finally leave at a high rate of speed. Mr. Mears also noticed that there was oil on the ground where the truck had been parked.

Based on the information received from the Flanders and Mr. Mears, the Bennington Police Department issued two "be on the lookout" (BOL) bulletins to neighboring Vermont, New York, and Massachusetts police units. The first BOL, issued at 12:28 a.m., stated:

> BOL for the following vehicle in connection with a robbery that just occurred in Bennington, Vermont. A pickup truck, unknown reg[istration] or make. Loud exhaust, leaking oil, sputtering. Two male occupants, one with long hair and one with the first name of Gary. Should be in the possession of a small safe. This robbery took place on Grove St[reet] in Bennington. The two males driving the above vehicle beat and injured an elderly couple before robbing them at their residence.

A follow-up bulletin, broadcast at 12:48 a.m., contained this additional information:

> The vehicle's described as a late model full size pickup truck with oversized taillights. The rear of the truck is closed in (possible cab [sic] on back) and has some sort of a fin or spoiler on rear of it. One of the male subjects is described as being 5[']10["], 160 [pounds], wearing light colored pants.

At approximately 1:30 a.m., Officer Davendonis from the Hoosick Falls, New York, police department observed a pickup truck which appeared to match the vehicle described in the BOLs. The truck had two occupants who matched the BOL descriptions and appeared frightened and disconcerted. He followed it to a convenience store where the driver bought a quart of oil. He finally encountered the vehicle while it was parked behind a school bus garage. The officer approached the vehicle and asked the driver to step out of the truck and provide identification. The driver identified himself as Gary Skidmore but did not have a license or registration. Attempts to obtain information on the vehicle registration number or the name failed be-

cause Vermont's computer that provides such information was not operating. The officer then radioed for assistance from the New York State Police. While waiting for assistance, the officer asked Skidmore where he was coming from and going to, and Skidmore provided inconsistent responses to these questions.

Two New York State Police officers, Troopers Duff and Overdorf, arrived in response to the call for assistance. Trooper Duff observed a shotgun in the pickup truck and asked the passenger, later identified as the defendant, to step out of the cab so that he could remove the shotgun. Defendant exited the vehicle. While Trooper Duff was removing the shotgun, he observed a paper sack, open at the top, which appeared to contain shredded paper currency. Officer Duff then asked the other officers to handcuff Skidmore and defendant. Defendant was handcuffed and placed into the rear of a police vehicle. Skidmore, however, pushed Trooper Overdorf and escaped into the surrounding woods. Skidmore surrendered to police officers the following day.

Officers Briggs and Colgan of the Bennington Police Department arrived at the scene to participate in the investigation. Officer Briggs was familiar with defendant and approached him. After Officer Briggs identified himself, defendant immediately stated, "I'll tell you one thing, I didn't beat those old people." There was no further conversation with defendant until 3:15 a.m. at the Hoosick Falls police barracks when Officer Briggs read defendant his *Miranda* rights from a form consisting of seven parts, each followed by a question asking defendant whether he understood the preceding part.[1] Defendant an-

---

[1] The form, entitled "Miranda Warnings," contained the following language:
1. "You have the right to remain silent."
Do you understand? Reply: _____.
2. "Anything you say can and will be used against you in a court of law."
Do you understand? Reply: _____.
3. "You have the right to talk to a lawyer before any questioning and to have him present with you during any questioning."
Do you understand? Reply: _____.
4. "If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before any questioning, if you wish. In Ver-

swered "yes" to each question, and Officer Briggs recorded each response on the form. In answering the seventh question, defendant indicated that he had his rights in mind and wished to talk with Officer Briggs. At 3:17 a.m., defendant signed a provision at the bottom of the form stating that he had been advised of his rights, understood them, and agreed to waive them. Defendant asked for a cigarette and was given a pack. He indicated that he would not sign a statement. He described his participation in the robbery but denied that he had assaulted the Flanders. He identified Gary Skidmore as his accomplice. The questioning ended approximately forty-five minutes later, after which defendant was brought to a jail cell and allowed to sleep.

Approximately four hours later, defendant was questioned by an officer of the New York State Police Department.[2] He was read a version of the *Miranda* rights from a New York State Police form. He was not required to respond to each part, but he acknowledged verbally that he had been advised of and understood his rights and that he agreed to waive these rights and speak with the officer. Although he refused to sign the form or a

---

mont, that is called a public defender."
Do you understand? Reply: _____.
5. "If you decide to answer questions, you may stop the questioning at any time."
Do you understand? Reply: _____.
6. "Do you understand each of these rights I have explained to you?"
 Reply: _____.
7. "Having these rights in mind, do you want to talk to me now?"
 Reply: _____.
 Waiver:

I have been advised of my rights and I understand them. No threats or promises have been made to me. Knowing my rights, I agree to waive them and talk to you now.
 Signature: _____.

[2] Defendant has included in his printed case a *Miranda* rights and waiver form which defendant saw after he gave a statement orally and before he agreed to the accuracy of the typed version of the statement. The evidence indicates that he was originally read his rights from a card and waived pursuant to the statement on the card. There are differences between the waiver language on the card and the language on the form. Because defendant's attack on the validity of this waiver is based solely on the form, our analysis will focus on the waiver language contained in the form. See note 5, *infra*.

written statement, he again admitted that he had participated in the robbery. The interview was concluded at approximately 11:00 a.m.

The two officers who took statements noted that defendant had been drinking during the evening, but both concluded that defendant showed no signs of impairment before or after giving his statements. After he was returned to Vermont, defendant filed several pretrial motions to suppress physical evidence and his own statements. He entered a conditional guilty plea to a charge of burglary, reserving the right to appeal the denial of his suppression motions.

## II.

Defendant first challenges the legality of the initial stop by Officer Davendonis and the trial court's refusal to suppress evidence obtained from Skidmore's pickup truck during that stop. Defendant contends that the evidence should have been suppressed under the federal and Vermont Constitutions because there was no probable cause to arrest him or conduct a search either at the time Officer Davendonis stopped the vehicle or soon thereafter. The trial court held that the officer had probable cause to arrest defendant at the time of the stop, and further concluded that, if probable cause did not exist initially, there was reasonable suspicion to warrant an investigatory stop, and that this reasonable suspicion quickly ripened into probable cause.

Police officers may conduct a warrantless investigatory stop when specific and articulable facts, taken together with rational inferences from those facts, warrant a reasonable belief that a suspect is engaging in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968); *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *State v. Schmitt*, 150 Vt. 503, 507, 554 A.2d 666, 668 (1988). A warrantless investigatory stop may also be made based on reasonable suspicion that the person stopped was involved in a completed felony. *United States v. Hensley*, 469 U.S. 221, 229 (1985). An investigatory stop must be brief, however, and "any further detention must be based on consent or probable cause." *State v. Phillips*, 140 Vt. 210, 215, 436 A.2d 746, 749 (1981). In the present case, the BOLs contained more than ample information to create reasonable suspicion and justify an

investigatory stop. Officer Davendonis spotted a vehicle which, as stated in the BOL, had a loud exhaust, a sputtering engine, an oil leak, and two male occupants. During the brief questioning following the stop, the driver identified himself with the same first name as specified in the BOL and gave inconsistent responses to questions about his route and destination. There can be no doubt that the officer had probable cause at that point to arrest the occupants of the vehicle. See *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (probable cause to arrest exists where facts and circumstances were sufficient to warrant a prudent person to believe that defendant had committed an offense); accord *State v. Paquette*, 151 Vt. 631, 635, 563 A.2d 632, 635–36 (1989).

Defendant complains that the BOL was inadequate because the neighbor did not confirm visually that the vehicle which returned to the victims' home was the same vehicle he had seen earlier. Defendant's argument would turn suspicion into certainty. The combination of what Mr. Mears saw and heard, along with the victims' statements, supported the BOL information and was sufficient to constitute the "specific and articulable" facts needed to justify reasonable suspicion.

█ Defendant also contends that Officer Davendonis was not entitled to ask Skidmore to exit his vehicle as part of the stop and that his doing so constituted a warrantless arrest without probable cause. Although there is no bright-line test for distinguishing between a stop and an arrest, it is useful to look at a number of factors in determining the reasonableness of an investigative stop, including the time, place, duration, and degree of intrusiveness of the stop. *United States v. Pelusio*, 725 F.2d 161, 165–66 (2d Cir. 1983). Moreover, "[t]he permissible duration and intrusiveness of an investigative stop depend on the extent of the law enforcement interest and the seriousness of the conduct giving rise to a reasonable suspicion of unlawful activity." *Id.* at 165. For example, we have held previously that when a police officer has a reasonable suspicion that an individual is driving under the influence of alcohol, he may order that individual to exit a vehicle "in order to confirm or negate his suspicions regarding probable cause to arrest." *State v. Jewett*, 148 Vt. 324, 330, 532 A.2d 958, 961 (1986). Although a police officer's order to exit an automobile is a further "seizure" beyond the scope of a brief *Terry* stop, such an order is within

"the realm of legitimate law enforcement conduct where the suspected criminal activity is DUI." *Id.*

■ ■ Here, soon after making the stop, the officer requested that defendant leave his vehicle. The officer's questions were minimally intrusive. The officer made the stop alone at night, had reason to believe the occupants might be dangerous, and knew the vehicle contained a shotgun. Where a police officer has made an initial stop based on a reasonable suspicion that the occupants have participated in a violent felony and there is a high likelihood that the occupants might be dangerous, we see no reason to preclude the officer from taking the protective measure of asking the occupants to step from the vehicle. See *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) ("we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile"). In the context of the initial stop, such a request did not elevate the detention to the level of an arrest. The trial court did not err in denying defendant's motion to suppress evidence.[3]

### III.

The remainder of defendant's claims focus on the admissibility of the oral statements he gave to the Vermont and New York police officers. At the outset, we address defendant's claim that the Vermont Constitution requires the State to prove both the voluntariness of a confession and a waiver of *Miranda* rights beyond a reasonable doubt rather than by a preponderance of the evidence. We start with the claim that in judging a motion to suppress the court must find the voluntariness of a confession beyond a reasonable doubt.

As defendant recognizes, federal law is against his position. In *Lego v. Twomey*, 404 U.S. 477 (1972), the United States Supreme Court ruled that the United States Constitution requires that a confession be shown to be voluntary only by a preponderance of the evidence. The Court emphasized the fundamen-

---

[3] Defendant also asserts that evidence subsequently seized from a friend's apartment was inadmissible because the affidavit supporting the search warrant was based on information obtained during the "illegal search and seizure" of his vehicle. Since the initial stop and search were entirely lawful, defendant's "fruit of the poisonous tree" claim is without merit.

tal distinction between proving the essential elements of a crime and establishing the voluntariness of a confession. The former bears directly on the reliability of a jury's guilt/innocence determination; the latter is concerned primarily with determining the admissibility of evidence. *Id.* at 486–87. As the Court stated:

> Since the purpose that a [suppression] hearing is designed to serve has nothing whatever to do with improving the reliability of jury verdicts, we cannot accept the charge that judging the admissibility of a confession by a preponderance of the evidence undermines the mandate of *In re Winship*, 397 U. S. 358 (1970). . . . *Winship* went no further than to confirm the fundamental right that protects "the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." A high standard of proof is necessary, we said, to ensure against unjust convictions by giving substance to the presumption of innocence. A guilty verdict is not rendered less reliable or less consonant with *Winship* simply because the admissibility of a confession is determined by a less stringent standard.

*Id.* (citations omitted).

We have followed the standard of proof endorsed by *Lego* whenever the issue of voluntariness has arisen. E.g., *State v. Harbaugh*, 132 Vt. 569, 576–77, 326 A.2d 821, 826 (1974) (since "the matter here involved is the admissibility of evidence rather than proof of an essential element of the crime, the measure of proof required is not proof beyond a reasonable doubt, but proof by a preponderance of the evidence"); accord *State v. Brunell*, 150 Vt. 388, 390, 554 A.2d 242, 243 (1988); *State v. Breznick*, 134 Vt. 261, 265, 356 A.2d 540, 542 (1976); *State v. Badger*, 141 Vt. 430, 439, 450 A.2d 336, 341 (1982). Significantly, in *Badger*, the Court went on to analyze suppression issues raised under the Vermont Constitution without suggesting that voluntariness should be judged by a different standard of proof under Vermont law. See *id.* at 450–51, 450 A.2d at 348.

■ We reject defendant's argument that the court must determine voluntariness beyond a reasonable doubt. First, we believe that defendant's interests are adequately protected by our

use of the "Massachusetts rule" whereby voluntariness is first considered by the court in determining the admissibility of a confession and then is reconsidered by the jury on whether to rely on the confession. See *State v. Harbaugh*, 132 Vt. at 579, 326 A.2d at 827; V.R.E. 104(a). The requirement that the jury determine voluntariness was adopted because reliance on the determination of the judge alone "contains aspects of harshness inconsistent with the general administration of criminal law in this jurisdiction" and gives the determination of the judge "an aura of infallibility which . . . is not consistent with the general concepts of the right to jury trial." *Harbaugh*, 132 Vt. at 579, 326 A.2d at 827. The jury determination of voluntariness is made beyond a reasonable doubt. See *Commonwealth v. Tavares*, 385 Mass. 140, 152, 430 N.E.2d 1198, 1206 (1982). Because we use the Massachusetts rule, the question is not whether the voluntariness of a confession should be determined beyond a reasonable doubt, but only whether voluntariness must additionally be determined by the judge by that standard. Whatever the outcome of this appeal, the jury will continue to determine voluntariness by the higher standard of proof. We accept the critical importance that this determination be made accurately, but remain unconvinced that the use of this standard by the judge is necessary to that accuracy. As the United States Supreme Court found in *Lego*, "no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence." 404 U.S. at 488. This is especially true where the voluntariness of the confession must be proved to the jury beyond a reasonable doubt.

Additionally, we find nothing in the Vermont Constitution that suggests a result different from that in *Lego*. Unlike other states, see, e.g., *State v. Phinney*, 117 N.H. 145, 146–47, 370 A.2d 1153, 1153–54 (1977), we have not historically required that the court determine the admissibility of a confession beyond a reasonable doubt. Nor have we required this elevated standard of proof in other contexts beyond proof of the elements of a criminal case. We agree with the Court's analysis in *Lego* that the voluntariness of the confession is not an element of the offense and that the standards used in determining the admissibility of evidence do not relate directly to the reliability of jury verdicts. See 404 U.S. at 486–87.

We turn now to defendant's claim that the State must prove the waiver of a suspect's *Miranda* rights beyond a reasonable doubt. The standard used at the federal level in judging whether *Miranda* rights have been waived is set out in *Colorado v. Connelly*, 479 U.S. 157 (1986). *Connelly* follows *Lego* in holding that the waiver need be shown only by a preponderance of the evidence for generally the same reasons. *Id.* at 167–69. The Court noted that the "auxiliary protections established in *Miranda*" should not warrant a higher standard of proof than that used in establishing the voluntariness of confessions. *Id.* at 169.

■ Anticipating *Connelly*, we have consistently held that a waiver of *Miranda* rights must be established only by a preponderance of the evidence. See, e.g., *State v. Breznick*, 134 Vt. at 265, 356 A.2d at 542. In one sense, the case for use of an elevated standard of proof is stronger here because a jury will never be required to determine the validity of a *Miranda* waiver. On the other hand, the issues are further removed from the elements of the criminal offense, and the *Miranda* rules are generally grounded in deterrence of law enforcement misconduct. On balance, we find less justification for an elevated standard of review. We note that a number of states that require the prosecution to prove the voluntariness of a confession beyond a reasonable doubt employ a preponderance standard for judging *Miranda* waivers. See, e.g., *Light v. State*, 547 N.E.2d 1073, 1079 (Ind. 1989); *State v. Langill*, 567 A.2d 440, 443 (Me. 1989). We see no grounds to hold under the Vermont Constitution that a *Miranda* waiver must be shown beyond a reasonable doubt. See *State v. Gleason*, 154 Vt. 205, 212, 576 A.2d 1246, 1251 (1990) (no reason to conclude that Article 10 of Vermont Constitution offers greater protection than the Fifth Amendment).

IV.

■■ Defendant's next claim is that his confessions were not voluntary and their admission violated Chapter I, Article 10, of the Vermont Constitution. It is settled law that Article 10 prohibits the taking and use of involuntary confessions. *State v. Badger*, 141 Vt. at 450, 450 A.2d at 348. Evidence obtained in violation of this provision cannot be admitted at trial. *Id.* at

452–53, 450 A.2d at 349. In order to be proven voluntary, a confession must be "the product of a rational intellect and the unfettered exercise of free will." *State v. Zehner*, 142 Vt. 251, 253, 453 A.2d 1126, 1127 (1982). Accordingly, it may not be induced by "threats, improper influence, or physical or psychological pressure." *Id.*

██ The trial court is, of course, the primary judge of the voluntariness of a confession. In reviewing the trial court's ruling, our role is to ensure that the trial court's findings are supported by substantial credible evidence and are not clearly erroneous. *State v. Stanislaw*, 153 Vt. 517, 529, 573 A.2d 286, 293 (1990).

Here, the trial court made specific findings concerning the defendant's physical and mental state at the time he confessed. The court considered and rejected defendant's claims that his confessions were involuntary because he had witnessed an "attempted shooting" of his accomplice and because he was impaired due to intoxication. In summary, the court found that

> [b]y all indications, the defendant was coherent and aware when he gave his statements. The evidence reveals that he showed the same signs of fatigue and fear that any person would in such a situation, but there was never an indication that his thought processes were so impaired as to deprive him of the ability to make the important decision as to whether or not he should give a statement.

On a review of the entire record, we conclude that these findings are supported by credible evidence and that the confessions were the product of "a rationale intellect and the unfettered exercise of free will." Cf. *State v. Clark*, 143 Vt. 11, 12–13, 460 A.2d 449, 451 (1983) (trial court findings not sufficient to establish whether intoxication prevented defendant from making knowing and intelligent waiver). The evidence supports the trial court's findings that defendant's observation of an officer attempting to shoot at Gary Skidmore had no effect on defendant's decision to confess. Further, the court properly found on the evidence that defendant's lack of sleep did not impair his thought processes. Defendant's claim of alcohol impairment was clearly overstated. He testified that the alcohol gave him a headache but he "could still communicate and walk."

██ In addition, there was no credible evidence that the investigating officers made any threats or promises to induce the confessions. The lone statement attributed to a police officer by defendant was, at best, ambiguous, and the trial court disbelieved defendant's claim that the statement was ever made. We conclude that the evidence supports the court's findings and they in turn support the decision that the defendant's confessions were voluntary.[4]

## V.

██ Defendant further claims that the trial court erred in finding that defendant effected a knowing and intelligent waiver of his *Miranda* rights under Vermont law. The State bears a heavy burden of proving a knowing and intelligent waiver of *Miranda* rights, *State v. Stanislaw*, 153 Vt. at 529, 573 A.2d at 293, and the trial court must "'indulge in every reasonable presumption against waiver.'" *State v. Malinowski*, 148 Vt. 517, 519, 536 A.2d 921, 923 (1987) (quoting *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). On review, however, "we will uphold trial court rulings that are not clearly erroneous and that are supported by credible evidence, even though inconsistencies or substantial evidence to the contrary may exist." *Stanislaw*, 153 Vt. at 529, 573 A.2d at 293.

Defendant contends his waiver was inadequate because: (1) the forms did not contain an explicit waiver of the right to counsel; and (2) defendant believed that an oral statement could not be used against him by the police. The first form, used by Officer Briggs, contained two warnings with respect to the right to counsel. The first was that defendant had "the right to talk to a lawyer before any questioning and to have him present with you

---

[4] Defendant insists that the trial court relied improperly on case law which reflected voluntariness standards set forth under the federal rather than the Vermont Constitution. We find little relevant distinction between state and federal standards in this area. The argument that the trial court's decision "clearly rested only upon federal law" is disingenuous. Much of defendant's argument is an attack on the United States Supreme Court decision in *Colorado v. Connelly*, 479 U.S. 157 (1986) (police misconduct is necessary element of involuntary confession), and his assertion that the holding does not apply under the Vermont Constitution. However, since there is nothing to suggest that the trial court in any way relied upon *Connelly*'s view of voluntariness doctrine, the decision is irrelevant to our discussion.

during any questioning." Following the warning, defendant was asked verbally, "Do you understand?" and he responded, "yup." The second warning advised him that a lawyer would be appointed for him if he could not afford one. Again, it was followed by "Do you understand?" and defendant answered, "right." Following all the warnings was a general waiver statement as follows:

I have been advised of my rights and I understand them. No threats or promises have been made to me. Knowing my rights, I agree to waive them and talk to you now.

Defendant's signature appears directly under the waiver, followed by a recording of the time as 3:17.

The second form, used by Officer Gundrum of the New York State Police, contained similar warnings about the right to counsel. It did not, however, require defendant to respond that he understood each right. Following the warnings, it had a general waiver statement: "I fully understand these rights, and at this time I agree to give up my rights and make the following statement."[5] Defendant refused to sign this waiver although the trial court found that he orally agreed to the waiver.

Defendant's attack on the waiver forms is based on *State v. Malinowski*, 148 Vt. at 521, 536 A.2d at 924, where we held a waiver form to be ambiguous. There are some similarities between the form used in *Malinowski* and the forms used here. There are, however, major differences. The *Malinowski* form contained no explicit waiver language; instead, it said, "Having these rights in mind, do you want to talk to me now?" Each of the forms here asked specifically for a waiver or the giving up of the enumerated rights. The ambiguity present in *Malinowski* is not present here. Thus, contrary to defend-

---

[5] As indicated at note 2, *supra*, defendant has argued from this form although it was apparently used after defendant gave an oral statement and before he gave a written statement. The card used at the beginning of the questioning contains waiver language virtually identical to that involved in *State v. Malinowski*, without the use of the phrase "I agree to give up my rights." Defendant apparently does not see any significance in the different language. The trial court appears to have assumed that it was dealing with language sufficiently similar to that in *Malinowski* that it could validate the waiver based on defendant's experience, knowledge, and understanding. We also note that defendant had given a waiver in response to the form used by Officer Briggs only five hours earlier.

ant's argument, there was an express waiver of the right to counsel in both instances in this case. The fact that the second waiver was oral, and not in writing, does not make it invalid. *State v. Breznick*, 134 Vt. at 264–65, 356 A.2d at 542.

Even if the form contained the ambiguity discussed in *Malinowski*, that would not necessarily invalidate the waiver. *Malinowski* holds that the court must go on to evaluate defendant's understanding of the form in light of his experience, education, background, intelligence and capacity to understand the warnings and the significance of a waiver. 148 Vt. at 522, 536 A.2d at 924. That step, omitted in *Malinowski*, was performed here. The court found that defendant was familiar with *Miranda* warnings and on different occasions had waived and invoked his rights. It found that he had the reading and writing skills to read and understand the forms and that he was selective in answering questions, demonstrating that he knew he had the right to refuse to answer. As discussed above, the court also found that defendant suffered no serious impairment due to stress, fatigue, or intoxication. The court's rejection of defendant's arguments about the form is fully supported by the record.

At the suppression hearing, defendant argued that he thought that the warnings meant that only statements given in court, and not those given at the police station, could be used against him. In this Court, he argues that the facts show that he thought that oral statements could not be used against him and that is why he did not make a written statement. However the argument is framed, the trial court rejected it because the language of the warnings was clear and unambiguous and defendant was experienced in receiving and using *Miranda* warnings. The court concluded, "There is nothing in the evidence to indicate that Mr. Caron was unable to comprehend the plain meaning of the *Miranda* warning." We must uphold the trial court's conclusion as not clearly erroneous and supported by substantial evidence. See *State v. Stanislaw*, 153 Vt. at 529, 573 A.2d at 293.

In sum, we conclude that neither of defendant's attacks on his waiver of *Miranda* rights is supported by the record. The finding of waiver must stand.

## VI.

Finally, defendant argues that his confessions should have been suppressed because his waiver of his right to counsel was ineffective under the Vermont Public Defender Act, 13 V.S.A. §§ 5231–5277. Section 5234 of the Public Defender Act provides, in relevant part:

> (a) If a person who is being detained by a law enforcement officer without charge or judicial process . . . is not represented by an attorney under conditions in which a person having his own counsel would be entitled to be so represented, the law enforcement officer . . . shall:
>
> (1) Clearly inform him of the right of a person to be represented by an attorney and of a needy person to be represented at public expense; and
>
> (2) If the person detained . . . does not have an attorney and does not knowingly, voluntarily and intelligently waive his right to have an attorney . . ., notify the appropriate public defender that he is not so represented.

Section 5237 defines the requirements for an effective waiver under the statute:

> A person who has been appropriately informed under section 5234 of this title may waive in writing, or by other record, any right provided by this chapter, if the court, at the time of or after waiver, finds of record that he has acted with full awareness of his rights and of the consequences of a waiver and if the waiver is otherwise according to law. The court shall consider such factors as the person's age, education, and familiarity with the English language, and the complexity of the crime involved.

According to defendant, he did not waive his right to counsel "in writing, or by other record" with respect to either statement as required by the statute, and this failure requires suppression of the statements given to the investigating officers. As discussed above, there were two waivers in this case. With respect to the first, which was in writing and was signed by defendant, his argument is that it does not explicitly waive his right to counsel. With respect to the second, his argument is that the waiver is not in writing.

 With respect to the first statement, the State argues that defendant never attacked it below. It is clear that the trial court did not believe that defendant was challenging the first statement on statutory grounds and never addressed the issue. We will not review claims raised initially on appeal unless they amount to plain error. V.R.Cr.P. 52(b); *State v. Schmitt*, 150 Vt. at 505, 554 A.2d at 667. Although we consider preservation debatable here, we reach the merits because defendant's claim can easily be disposed of.[6]

 We find nothing in either § 5234 or § 5237 to suggest that a waiver must be any more explicit to meet the requirements of those statutes than it must be to comply with *Miranda*. The description of the standards for waiver in § 5234(a)(2) is identical to the description in our cases implementing *Miranda*. See, e.g., *State v. Harvey*, 145 Vt. 654, 657, 497 A.2d 356, 358 (1985) (waiver must be voluntary, knowing, and intelligent). In fact, we have already held in *State v. Picknell*, 142 Vt. 215, 225, 454 A.2d 711, 715 (1982), that once the court found a waiver of the right to counsel under the *Miranda* standards, the provisions of § 5234(a) "were fully complied with." Section 5237 simply restates part of this standard and adds nothing to defendant's argument. Since we have found a valid *Miranda* waiver for the statement to the Vermont police officer, there is no violation of §§ 5234 or 5237.

The second statement subject to the suppression motion was made after a waiver that was not in writing. The trial court concluded that the oral waiver given to the New York investigators satisfied the requirements because the statutory language does not preclude an oral waiver and because prior case law does not require that a written waiver form be signed by the defendant. See, e.g., *State v. Breznick*, 134 Vt. at 265, 356 A.2d at 542. We are unable to agree with the trial court's construction of § 5237. We conclude that the statute contemplates more than a police officer's written memorandum of an oral waiver given by a suspect.

---

[6] We assume that, but need not examine the extent to which, Vermont officers acting within the scope of their duty beyond Vermont state borders are bound by the Vermont Public Defender Act. Nor do we reach the question of whether officers from other jurisdictions, operating within Vermont, must comply with the Act.

Although the federal constitution does not require a recorded waiver of a defendant's *Miranda* rights, *id.* at 264–65, 356 A.2d at 542, the Public Defender Act imposes additional statutory requirements. See, e.g., *State v. Nicasio*, 136 Vt. 162, 165, 385 A.2d 1096, 1098 (1978) (Act requires notification of public defender if defendant has no attorney and has not effectively waived the right to one). The Vermont public defender statute is taken in large part from the Model Public Defender Act, adopted by the National Conference of Commissioners on Uniform State Laws in 1970. See *Handbook of the National Conference of Commissioners on Uniform State Laws* 267–83 (1970) for the full text of the model act. Section 5237 of the statute is essentially identical to § 7 of the Model Act. *Id.* at 277. The comment to § 7 states: "The requirement that [the waiver] be written or otherwise recorded not only provides evidence of the act but makes clear that the mere absence of a request for counsel . . . cannot be construed as a waiver." *Id.* The comment contradicts the trial court's rationale that the statutory mandate that a waiver be "in writing, or by other record" was not intended to be exclusive. See also *Jandro v. State*, 781 P.2d 512, 520 (Wyo. 1989) (construing Wyoming statute, which is also patterned after § 7 of the Model Act, to require more than mere oral waiver). In support of the trial court's second rationale—that our prior case law does not require a waiver to be signed by the suspect—the State maintains that the legislature, in adopting this provision, "recognized that . . . the record may be established by the law enforcement officer." However, the provision states unequivocally that the *person detained* "may waive in writing, or by other record, any right provided in this chapter." We cannot accept that this language validates a waiver because the officer uses a written form and signs as a witness to an oral waiver.[7] Although the form, along with the officer's notations, may constitute a "record," it is not one created by the action of the defendant. Moreover, we are not convinced that the State's construction of the statute will prevent the mere absence of a

---

[7] In *State v. Picknell*, this Court found compliance with the public defender statute even though the waiver was oral and there was no other record of the waiver. However, defendant in that case argued only that the waiver did not comply with § 5234(a)(2), and the Court considered only that provision. See 142 Vt. at 224–25, 454 A.2d at 715.

request for counsel from being construed as a waiver.[8] Where, as here, statutory language is plain and unambiguous, we must enforce the statute according to its terms. *Vermont Development Credit Corp. v. Kitchel*, 149 Vt. 421, 428, 544 A.2d 1165, 1169 (1988).[9]

Although we cannot accept the State's argument that the requirements of § 5237 were met in this case, we find other grounds for affirming the denial of the motion to suppress. We conclude that the statute does not bind the extraterritorial conduct of police departments from other jurisdictions. The Vermont Public Defender Act was adopted to replace the existing system for assigned counsel with a more effective and less costly statewide program to provide legal services for indigent criminal defendants. See generally *Vermont Public Defender Act: Hearings on H. 267 Before the Senate Judiciary Committee,* 1971, Adj. Sess. (April 18, 1971); C. Decker, *A Study of Criminal Defense Services in the State of Vermont with a Design and Program for Improvement Through Legislation* (1971). The statute, in essence, guarantees effective assistance of counsel, through Vermont public defenders, to persons detained by Vermont law enforcement officers for crimes committed here. If a suspect is detained in another jurisdiction and interrogated by police officers from that jurisdiction, he or she is subject to the statutory protections of that jurisdiction as well as those of the federal constitution. See, e.g., *State v. Krogness*, 238 Or. 135, 138, 388 P.2d 120, 122 (1963) (evidence seized in violation of federal constitution, by Washington police officers operating within Washington state, inadmissible in Oregon state court).

---

[8] Five other jurisdictions have adopted, in modified forms, statutory schemes based on the Model Public Defender Act. See Alaska Stat. § 18.85.010-170 (1986); Idaho Code § 19-851-866 (1987); Ky. Rev. Stat. Ann. § 31.100-250 (1985); N.M. Stat. Ann. § 31-16-1-10 (1984); Wyo. Stat. § 7-6-101-114 (1987). Although the Model Act has been in effect in some version since as early as 1968, there is no reported case law defining what constitutes a waiver "in writing, or by other record." The Wyoming legislature in 1987 repealed the provision in their statute that required a waiver to be in writing or otherwise recorded. See *Jandro v. State*, 781 P.2d at 519.

[9] We need not decide in this case what would constitute an "other record" for purposes of compliance with § 5237. Certainly, it would include an audio or video tape recording of an oral waiver.

■ We must construe a statute according to its purpose and the intent of the legislature. See *Burlington Elec. Dep't v. Vermont Dep't of Taxes*, 154 Vt. 332, 335, 576 A.2d 450, 452 (1990); *Hinsdale v. Village of Essex Jct.*, 153 Vt. 618, 623, 572 A.2d 925, 928 (1990). Where possible, we must construe it to reach a rational result. *Boutin v. Conway*, 153 Vt. 558, 562, 572 A.2d 905, 907 (1990).

■ The purpose of the defender statute is to supply the advice of a Vermont public defender to persons who are being investigated for Vermont crimes, or are charged with such crimes, whenever the person would be entitled to private counsel. See 13 V.S.A. § 5233(a)(1). There is no indication that the legislature intended to supply a Vermont public defender to a person detained in another state and being questioned by an officer from that state about crimes that may have occurred there as well as in Vermont.[10] Nor is it rational to assume that the Vermont legislature wanted to supersede the judgment of another state's legislature in defining when lawyers of that state must be supplied to criminal suspects or how the right to counsel can be waived. This kind of application of the statute was clearly outside the contemplation of the legislature, and the statute should not be construed to cover it. *City of Winooski v. City of Burlington*, 154 Vt. 325, 326–27, 575 A.2d 199, 199–200 (1990).

■ Defendant's statement to the New York State Police is not subject to suppression for violation of the Vermont Public Defender Act. The motion to suppress the statement was properly denied.

*Affirmed.*

---

[10] The New York officer who conducted the interrogation indicated that defendant was being held as a fugitive from justice and was taken from the interrogation to a New York court for arraignment. He indicated that in conducting the questioning he was interested, among other matters, in whether defendant violated New York gun laws or possessed stolen property in New York. The record does not indicate exactly what transpired in New York or whether charges are pending in that state. Vermont immediately sought extradition, and defendant waived extradition proceedings in New York. He was returned to Vermont.

As indicated in note 6, *supra*, we assume, but do not decide, that a Vermont officer acting in another state is bound by the Vermont Public Defender Act.