Hutchins v. Peterson, No. 480-10-00 Wmcv (Wesley, J., Jan. 30, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


**STATE OF VERMONT**
**WINDHAM COUNTY, SS.**

**LISA HUTCHINS and**
**DUSTIN HUTCHINS,**
          **Plaintiffs,**

**v.**                                              **WINDHAM SUPERIOR COURT**
                                                    **DOCKET NO. 480-10-00 Wmcv**

**MICHAEL PETERSON,**
**SHAWN LUNDRIGAN and**
**THOMAS L'ESPERANCE,**
          **Defendants.**


### ORDER ON DEFENDANTS' MOTIONS FOR JUDGMENT


In 1997, Plaintiff was arrested and charged with selling crack cocaine to an undercover

officer, Defendant Lundrigan. The charges against Plaintiff were dismissed without prejudice in

1998. In 2000, Plaintiff brought this action alleging that Defendants, all of whom were involved

in her arrest, had violated her rights under the federal constitution, had violated her rights under

the state constitution, and had committed various torts against her under state common law.

Defendants removed the case to federal district court and moved to dismiss on qualified

immunity grounds. In March 2001, the federal court denied Defendants' motion to dismiss for

lack of a prima facie case, reasoning that Plaintiff might be able to show lack of probable cause

to support Plaintiff's arrest, and that Defendants would not be entitled to qualified immunity if

they arrested her without probable cause.  See <u>Hutchins v. Peterson</u>, 139 F.Supp.2d 575 (2001).

However, in October 2002, after discovery, the federal court concluded that Defendants were

entitled to qualified immunity because the evidence, even viewed favorably to Plaintiff, established that Defendants

had probable cause to arrest and proceed against her.  Thus, the arrest and prosecution did not violate clearly

established rights of which the officers should have known, and they were entitled to qualified immunity.  The

federal court then granted summary judgment for Defendants on the federal claims, but remanded the state claims to

this Court.  <u>Hutchins v. Peterson</u>, 2:00-CV-457, "Opinion and Order" issued October 21, 2002.  Plaintiff took no

appeal from the federal order.

Defendants Lundrigan and Peterson have filed motions for summary judgment, and Defendant L'Esperance

has filed a motion for judgment on the pleadings, which Defendants Lundrigan and Peterson have also joined.  As

these motions all rely on issue preclusion and qualified immunity, the Court will address them together, applying a

summary judgment standard.    Based on the Vermont Supreme Court's recent decision in <u>Stevens v. Stearns</u>, 2003

VT 74, 14 Vt. L.W. 211 (2003), the Court concludes that the federal court's determinations

as to probable cause and qualified immunity is entitled to preclusive effect, and that Defendants' motions for

judgment must be **GRANTED**.  Furthermore, the Court concludes that the other pending motions   –  Plaintiff's

motion to amend her complaint, and three discovery motions filed by Plaintiff (one against each Defendant)  –

should be **DISMISSED AS MOOT**.

**Background**

---

[1]  Summary judgment is appropriate if, viewing the evidence favorably to the non-moving party and giving her the benefit of all reasonable doubts and inferences, the Court determines that there are no genuine questions of material fact and the moving party is entitled to judgment as a matter of law.  See <u>Select Designs, Ltd. v. Union Mutual Fire Ins. Co.</u>, 165 Vt. 69, 72 (1996).

[2] The Court acknowledges that its Entry Order issued May 1, 2003 allowed Plaintiffs to pursue further discovery in an effort to undermine the probable cause determination.  However, that order was issued before the decision in <u>Stevens</u> clarified the application of claim preclusion in this context.

In the fall of 1997, the Southern Vermont Drug Task Force was investigating a suspected crack house on Maple Street in Brattleboro. As part of the investigation, Officer Lundrigan went into the house undercover to purchase crack cocaine. One of his purchases was from a white woman. During another purchase three days later, another dealer identified this woman as "Julie." Officer Lundrigan later described "Julie" as in her thirties, with straight, shoulder length, dirty blond hair, and tattoos on her left arm. Two and a half weeks later, the task force raided the crack house and arrested several members of the drug distribution ring. However, "Julie," the woman who sold crack to Officer Lundrigan, was not there.

Officers Peterson (a Brattleboro policeman working as a liaison with the task force), L'Esperance (a supervisor with the task force), and Lundrigan attempted to identify "Julie" by having Lundrigan look, one by one, at white females whom they knew had been at the crack house based on videotape surveillance. Officer Lundrigan considered two women before he considered Plaintiff. One of these women was Julie Maynard -- a woman who spent a lot of time in the house and had her own room there. A videotape of the front and side of the house taken on the day of Lundrigan's purchase showed Julie Maynard was there on that day. Furthermore, there was evidence that a dog was in the house at the time of Officer Lundrigan's purchase of crack from the woman, and that Julie Maynard had a dog. A diagram found in Officer L'Esperance's file seems to indicate that based on these circumstances, someone with the force had concluded that "Julie" was probably Julie Maynard. Nevertheless, Officer Lundrigan looked at Julie Maynard and concluded that she was not the one who had sold him the crack cocaine. The other woman Officer Lundrigan looked at and rejected was an unidentified woman in the parking lot of the Drop-In Center who had also been observed at the house during the investigation.

Officer Lundrigan was then taken to look at Plaintiff, as she had been seen at the crack house several times, and Officer Peterson felt that she fit the general description of "Julie" and was known to him to have "prior associations with persons known to use and/or sell illegal drugs". However, she had not been on the task force's list of house suspects, and was not on the videotape of the crack house on the day of the sale. She also did not exactly fit the description Officer Lundrigan had previously given of "Julie": she was in her late twenties rather than her thirties, with wavy dirty blond hair longer than shoulder length. She also had tattoos on both arms rather than just her left, and she wore a lot of jewelry, to the extent that it would have been logical to mention it in a description.

3

Nonetheless, Officer Lundrigan positively identified Plaintiff as the one who sold him the crack, and she was arrested.

Subsequent events shed doubt on Lundrigan's identification. Julieanna Shea, known as "Lisa" by other residents in the house, had been arrested as a member of the drug distribution ring. On March 14, 1998, almost four months after she and Plaintiff had been arrested, Julieanna Shea gave a sworn statement to the police saying that she had never met Plaintiff, and that Julie Maynard was the one who sold Officer Lundrigan the crack.

In April1998, the charges against Plaintiff were dismissed without prejudice. In 2000, she brought this action, and Defendants removed the case to federal court as described above. After discovery, which disclosed the evidence just summarized, the federal court granted summary judgment. The federal court acknowledged the existence of circumstances tending to indicate that the seller was Julie Maynard. While each Defendant maintained that at the time of the arrest he was unaware of any substantial evidence that would contradict Lundrigan's identification, they conceded for the purpose of the federal summary judgment proceeding that Plaintiff had been mistakenly identified. Nonetheless, the court concluded that given Officer Lundrigan's positive identification of Plaintiff, coupled with his consideration but positive rejection of Julie Maynard, the circumstances suggesting Julie Maynard was the seller were not logically compelling enough to negate the existence of probable cause at the time of the arrest, and nothing subsequently learned by the officers undermined it.

---

[3] Plaintiff's malicious prosecution claims are apparently based on the assumption that even if arresting officers have probable cause at the time of the arrest, they have a continuing duty to ensure that the arrested person is not prosecuted if they subsequently learn of information which undermines probable cause. For purposes of this motion, the Court accepts this assumption, as the federal court apparently did. However, the federal court held that the subsequently learned information (i.e., Julieanna Shea's statement that the seller was Julie Maynard rather than Lisa Hutchins) did not undermine the existence of probable cause, because that had been based on the undercover officer's positive eyewitness identification. Thus, for the purposes of the issue preclusion analysis, whether there was probable cause to prosecute or whether there was probable cause to arrest are analytically indistinguishable..

**Analysis**

The State Claims

Plaintiff alleges that Defendant officers violated her right to liberty under the Vermont Constitution, Chapter One, Articles 1, 9 & 10, and her right to be free from warrantless search and seizure under Article 11. In addition to these constitutional torts, Plaintiff also asserts state common-law tort claims based on theories of false arrest, false imprisonment, and malicious prosecution.

Qualified Immunity Under State Law

Under state law, "'lower-level government actors are immune from tort liability when they perform discretionary acts in good faith during the course of their employment and within the scope of their authority,'" and "'good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known.'" Stevens v. Stearns, 2003 VT 74, Para. 15. Here, Defendants' arrest of Plaintiff based on Officer Lundrigan's identification of her as the seller, despite circumstances suggesting the seller might be someone else, was clearly a discretionary act done in the course of their employment and within the scope of their authority. Thus, Defendants are entitled to immunity under state law if they acted in good faith – that is, if they did not violate Plaintiff's clearly established rights.

In Vermont, persons have a clearly established right not to be seized unlawfully. However, it is also clearly established that an officer may arrest a person, even without a warrant, if the officer has probable cause to believe the arrested person has committed a felony. See V.R.Cr.P. 3(a). It follows that the viability of Plaintiff's claims turns on whether Defendants had probable cause to believe she had committed a felony.

Issue Preclusion

Issue preclusion is appropriate if a final judgment on the merits has already been entered in litigation between the same parties; the same issue was adjudicated in that litigation as is now presented; the parties had a full and fair opportunity to litigate the issue in the prior action; and applying preclusion is fair. See Stevens, 2003 VT 74, Para. 13. Here, litigation between the same parties has produced a final judgment on the merits, determining that Defendants were entitled to qualified immunity with respect to the federal claims because they had probable cause to arrest Plaintiff. The pivotal question, then, is whether the issues of qualified immunity and probable cause currently before this Court are the same as the ones already decided in federal court.

Until recently, it was unclear whether preclusion should apply in this context, where questionable conduct on the part of a state official gave rise to both federal and state claims, and after removal, the federal court disposed of the federal claims on qualified immunity grounds but left the state claims to be dealt with in state court. In Stevens v. Stearns, 2003 VT 74, however, the Vermont Supreme Court clarified that issue preclusion could and should be applied to qualified immunity determinations made in federal court whenever the parallel federal and state claims are based on essentially the same facts and law.

In Stevens, the plaintiff brought an action for damages against a probation officer and others, claiming that they had illegally searched her home. 2003 VT 74, Para. 1. The plaintiff had consented to searches as a condition of probation, but she charged that the search in question occurred after her probationary period ended. The plaintiff brought her action in state court, alleging federal as well as state claims. After removal, the federal court granted summary

6

judgment for the defendants on the federal claims on qualified immunity grounds, reasoning that the termination date of the probation period was unclear, such that a reasonable probation officer could have concluded that she was still on probation and subject to a search. Id. at Para. 5. The plaintiff appealed the federal court decision, but it was affirmed. Id. at Para. 7.

The plaintiff in Stevens then pursued her state claims in state court. The trial court granted summary judgment for the defendants on all state claims, however, giving preclusive effect to the federal court's determinations regarding objective reasonableness and qualified immunity. On appeal, the plaintiff argued that collateral estoppel should not apply, reasoning that since the search and seizure protections of Chapter I, Article Eleven of the Vermont Constitution are in some instances greater than those provided by the Fourth Amendment to the Federal Constitution, the issues of objective reasonableness and qualified immunity under state law are simply not the same as the issues of objective reasonableness and qualified immunity under federal law. Id. at Paras. 16-17. The Vermont Supreme Court rejected this argument and affirmed. Pointing out that the "clearly established" right under both provisions is the right to be free from unreasonable searches and seizures, the Court held that "[t]he relevant question in both cases is whether, in light of plaintiffs' clearly established right to be free from unreasonable searches and seizures and in light of the information possessed by defendants, it was nonetheless objectively reasonable for defendants to believe that their conduct was lawful." Id. at Para. 23. The Court concluded that the issues were indistinguishable under state or federal law, and therefore the plaintiff was not entitled to a separate adjudication in state court, but was bound by the federal court's determination of qualified immunity.

Like the plaintiff's claims in Stevens, Plaintiff's claims here, whether federal or state, all

asserted essentially the same right – the right to be free from unlawful seizure, meaning the right to be free from arrest without probable cause.  Plaintiff nonetheless contends that Stevens does not control, because Stevens did not involve probable cause law, and probable cause under Vermont law differs from probable cause under federal law.  If probable cause *did* present different issues under state law, the parallel claims would not be based on essentially the same facts and law, and issue preclusion could not apply.  However, Plaintiff's suggestion that probable cause is different under Vermont law is unsupportable.

Plaintiff's argument stems from a distinction in the language of Article Eleven of the Vermont Constitution (which forbids searches and seizures without a warrant), compared with the language of the Fourth Amendment to the United States Constitution (which forbids *unreasonable* searches and seizures without a warrant), and the fact that Vermont has not followed federal Fourth Amendment jurisprudence in all respects.  Cf., e.g., State v. Sprague, 2003 VT 20, 14 Vt. L.W. 39 (officer conducting traffic stop cannot routinely ask driver to exit vehicle under state law, although such limited further restraint has been upheld under federal law; notably, the decision addressed *not* the scope of what constitutes probable cause, but rather the quantum of suspicion regarding other criminal activity short of probable cause that will suffice to justify additional investigatory detention after a stop based on probable cause for a motor vehicle violation). Plaintiff cites State v. Record, 150 Vt. 84, 86 (1988),ostensibly for its recognition of the difference in the two provisions, and of our Supreme Court's rightful authority to interpret Article Eleven in a manner different from the Fourth Amendment.  However, Plaintiff fails to note that the Court in Record actually rejected the very argument she is making – that the absence of the word "unreasonable" in Article Eleven warrants the conclusion that

8

Vermont law should be considered more protective than federal law in all aspects of search and seizure jurisprudence. See 150 Vt. at 85 ("the word 'unreasonable' is as implicit in Article Eleven as it is express in the Fourth Amendment"). Moreover, in State v. Caron, 155 Vt. 492 (1990), in which a defendant challenged the legality of his arrest under both federal and state law, the Court engaged in a single analysis, utilizing a single definition of probable cause. Id. at 500 (under federal and state law, probable cause to arrest exists where facts and circumstances are sufficient to warrant a prudent person to believe that the defendant had committed an offense). Therefore, the Court concludes that though Vermont in certain respects affords more protection against unlawful search and seizure than federal law, the issue particular to this case as to the elements of probable cause is the same under either state or federal analysis.

As demonstrated above, in assessing the applicability of issue preclusion, this case and its federal predecessor present the same probable cause and qualified immunity issues, and involve the same parties. Unless Plaintiffs can demonstrate that they were deprived of a full and fair opportunity to litigate the issues, the final judgment rendered in federal court is binding on them here. Stevens, supra. Yet, the Court concludes that Plaintiff had a full and fair opportunity to litigate the probable cause and qualified immunity issues in federal court. The federal court initially denied Defendants' motion to dismiss, allowing Plaintiff to pursue discovery. Plaintiff served, and received answers to, two sets of interrogatories, requests to produce, and requests to admit for each Defendant. She also took depositions. Following this ample discovery period,

---

[4] Plaintiff would have liked to pursue further discovery, in an attempt to find other circumstances which might strengthen the inference that the seller was Julie Maynard rather than Plaintiff. However, while a full and fair opportunity to litigate arguably includes adequate discovery, it clearly does not require limitless discovery. Furthermore, as the federal court held, "in evaluating the probable cause

9

Plaintiff was unable to convince the federal court that, given significant amounts of information suggesting a different seller, a prudent person in the position of any of the Defendants would not have believed she was the seller, despite the fact that Officer Lundrigan positively identified her as the seller. The federal court considered her evidence and arguments at length, but nonetheless concluded that there was probable cause to arrest her.

> Based on the totality of the circumstances, probable cause existed to arrest Hutchins. L'Esperance and Peterson reasonably relied on Lundrigan's identification of her, based on his having transacted a hand to hand sale three weeks before, and his having rejected Maynard, their more likely candidate, as the unknown "Julie". Assuming that the diagram from L'Esperance's investigative file was created before Hutchins arrest, it is information that suggests another culprit, but does not negate Hutchins' involvement. This and other arguably exculpatory evidence known to the officers warranted the officers' caution, in eliminating Maynard as the suspect before looking to another, but did not give them reason to doubt Lundrigan's veracity, nor to believe that his identification would be unreliable. "[A] police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest. Martinez, 202 F. 3d at 635 (quoting Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997)).

Hutchins v. Peterson, 2:00-CV-457, "Opinion and Order" (10/21/02) at p.12. Following the rejection of her claim as a matter of summary judgment, Plaintiff had the opportunity to appeal as a matter of right, but she chose not to do so.

---

determination, only the facts available to the officers at the time of the arrest are considered." Hutchins v. Peterson, 2:00-CV-457, "Opinion and Order" (10/21/02) at p.11, citing Martinez v. Simonetti, 202 F.3d 625, 635 (2d Cir. 2000) . Thus, the federal court concluded that "[t]he Shea affidavit can play no part in determining whether the police officers had probable cause". Id.at fn. 2. There is no basis in the present record for concluding that Plaintiff was given an inadequate opportunity in federal court to explore the facts that were available to the officers at the time of the arrest.

[5] Plaintiff cites State v. Dann, 167 Vt. 119 (1997) for the proposition that issue preclusion should not apply if the losing party did not have the ability or incentive to appeal. In Dann, however, the losing party was the State in a misdemeanor prosecution, and thus not entitled to appeal. Here, Plaintiff was entitled to appeal as a matter of right, and the Court cannot accept her suggestion that she did not have incentive to appeal. It is true that her decision not to appeal was made before Stevens was issued, but the issue preclusion issue was entirely foreseeable.

10

The final consideration is fairness. In considering whether it is fair to deny Plaintiff the opportunity to relitigate this qualified immunity issue, the Court believes it is appropriate to consider the nature and purpose of qualified immunity itself. Substantial social costs accompany suits against state officials, including the cost and distraction of the litigation and deterrence from going into public service. See Heleba v. Allbee, 160 Vt. 283, 292 (1992). Thus, the goal is to minimize protracted litigation of the type represented by this case by providing immunity for "all but the plainly incompetent or those who knowingly violate the law." Id. Moreover, since qualified immunity is immunity from the suit itself, not just from ultimate liability, it should be decided at as early a stage in the litigation as possible. Cf. Murray v. White, 155 Vt. 621, 626-27 (1991) (explaining why interlocutory denial of qualified immunity should be appealable under collateral order exception to finality rule).

It is now more than six years since the incident at issue here, and three years since this suit was initiated. Plaintiff is not responsible for all of this delay, but it is nonetheless the case that her claims remain hanging over the heads of these Defendants, causing these public officials exactly the type of distraction and worry that qualified immunity was meant to prevent. Plaintiff has pursued discovery and had the opportunity to convince a federal court that there was no probable cause to arrest her. That court considered her arguments at length, and explained its decision in detail. Considering all these matters, and in light of the implicit message of Stevens that federal-state issue preclusion in this context does not offend state interests or sensibilities as a general proposition, the Court cannot conclude that fairness requires giving Plaintiff another chance to pursue further discovery in a likely futile second attempt to establish that there was no probable cause.

Defendants' motions for judgment are therefore **GRANTED**.

Other Motions

Also pending are Plaintiff's motions to amend and three discovery motions. The focus of the discovery motions, as well as the arguably new allegation Plaintiff seeks to add, is the same: a diagram found in Officer L'Esperance's file that indicates that prior to November 24, 1997, the day of Plaintiff's arrest, the police believed Julie Maynard was probably "Julie." However, this is something the federal court assumed to be true for purposes of ruling on the motion, and something the officers conceded for purposes of that proceeding. Given this Court's analysis on issue preclusion, Plaintiff's motions could not affect the outcome. Accordingly, these motions will be **DISMISSED AS MOOT**.

## ORDERS

Defendants' motions for judgment are **GRANTED**, and judgment shall be entered for Defendants against both Plaintiffs.

Plaintiffs motion to amend, motion for sanctions against Defendant L'Esperance, motion to compel against Defendant Peterson, and motion to compel against Defendant Lundrigan are **DISMISSED AS MOOT**.

Signed at Brattleboro, Vermont, this _____ day of _____, 200__.


_____
John P. Wesley
Presiding Judge

---

[6] Although the Court's discussion has focused only on Plaintiff Lisa Hutchins' claims, judgment will also be entered on her son's claims, which are derivative.